| UNITED STATES BANKRUPTCY COURT | Hearing Date and Time: |
| EASTERN DISTRICT OF NEW YORK | April 4, 2022 @ 11:00 a.m. |

---------------------------------------------------------x

In re:                                                                    Chapter 11

975 Walton Bronx LLC,                                      Case No. 21-40487 (JMM)

                             Debtor.

---------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
## OF THE DEBTOR'S AMENDED PLAN OF REORGANIZATION

975 Walton Bronx LLC (the "Debtor") respectfully submits this Memorandum of Law in support of confirmation of the Debtor's Amended Chapter 11 Plan of Reorganization (ECF #57) (the "Plan"), notwithstanding the objection of the Debtor's secured mortgage creditor, Walton Improvement Group (the "Current Lender").

### Preliminary Statement

The Debtor's primary goal throughout this Chapter 11 case has been to restructure the underlying mortgage debt, and make a distribution to other creditors, so as to permit the Debtor to maintain ownership of its real property, consisting of multi-family residential apartment building located at 975 Walton Avenue, Bronx, New York (the "Property"), containing approximately 182 residential apartments and five (5) commercial stores.

To achieve this goal, the Plan divides creditors and interests into four classes as follows:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 1 | Current Lender | No | No |
| Class 2 | Thor 975 | Yes | Yes |
| Class 3 | General Unsecured Claims | Yes | Yes |
| Class 4 | Equity Interests | No | N/A |

The Plan provides several alternate treatments of the Class 1 Secured Claim of the Current Lender. It further provides for a partial payment to allowed Class 2 and 3 claims, and the

1

reconstituting and recapitalizing the membership interests in the Reorganized Debtor to be held by the New Investors in proportion to their respective New Value Contributions to fund the Plan.

The primary focus for the purposes of this Memorandum is on the Debtor's first treatment of the Current Lender's Secured Claim by reversing the acceleration of the mortgage debt and reinstating the Mortgage Note through a cure and reinstatement thereof in accordance with 11 U.S.C. §§ 1124(2) and 1123(d).

Should the Debtor be unable to effectuate a cure and reinstatement of the Mortgage, then the Plan provides for several alternate back-up treatments for the Current Lender's debt, including (i) the form of refinancing of the Mortgage with a new lender on terms sufficient to pay the Lender's allowed secured claim in full; or (ii) payment of the allowed amount of the Mortgage in full based on deferred cash payments as permitted under the cramdown provisions of 11 U.S.C. §1129(b)(2)(A)(i), utilizing a cramdown post-confirmation interest rate under the principles outlined by the Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951 (2004), and recognized in this Circuit under the precepts of *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787 (2d Cir. 2017). These alternate treatments will be the subject of future hearings before the Court following additional filings.

## Factual Background

The Court is respectfully referred to the Declaration of Larry Jeremias (the "Jeremias Declaration"), filed herewith in support of the Plan for relevant facts relating to the Plan and the requirements for confirmation. Terms previously defined in the Plan or the Jeremias Declaration shall have the same meaning for the purposes of this Memorandum.

**Legal Analysis**

**A. The Plan Meets the Requirements for a Cure and Reinstatement**

Section 1123 (a)(5)(G) of the Bankruptcy Code requires that a plan of reorganization must provide for the "curing or waiving of any default". Section 1124(2) permits a plan to effectuate Section 1123 by providing for the cure of a default and the reinstatement of maturity of the claim as it existed prior to the default.

The Debtor acknowledges that there were pre-petition monetary defaults which must be cured. Issues regarding the amount of the cure of the monetary defaults, however, are overshadowed by the Current Lender's allegation that there is an incurable default relating to the acquisition of a minority 49.9% membership interest in the Debtor by the New Investors in 2018. Accordingly, before turning to issues concerning the monetary default, this Memorandum will address the purported incurable default.

The Current Lender contends that the involvement of the New Investors violates the provisions of Section 7(a)(ix) of the Investors Loan Agreement, which include as part of the definition of an event of default:

> Except as may be otherwise specifically permitted herein, any change in the ownership of the Mortgaged Property or the equity ownership of the Borrower without the prior written consent of the Bank, which may be granted or withheld in the Bank's sole judgment . . . .

The Debtor believes that it can be established that the Current Lender was aware of the minority stake held by the New Investors when it acquired the Mortgage Note and never raised an objection or declared a default based on Section 7(a)(ix), either in the December 1, 2020 acceleration notice or the foreclosure complaint. It was only after bankruptcy that the Current Lender raised the issue, which brings into place principles of waiver and estoppel.

Indeed, even *arguendo*, if the minority interest held by the New Investors constitutes a change in ownership, there is no automatic default. Section 3(d) of the Investors Loan Agreement permits a change in control of the Building with the consent of Investors Bank upon the execution of an assumption agreement and the payment of a "transfer processing fee" equal to 1% of the principal amount of the loan. The Debtor submits that the failure of either Investors Bank or the Current Lender to object to the involvement of the New Investors constitutes the requisite consent for purposes of Section 3(d). The fact that an assumption agreement needs to be executed and the transfer processing fee must be paid are both curable events. *See*, *In re Charter Communications*, 419 B.R. 221, 249 (Bankr. S.D.N.Y. 2009) (finding "no impermissible change of control" that would bar a cure and reinstatement).

Moreover, the failure of both Investors Bank and the Current Lender have failed to declare a default by reason of the New Investors' acquisition of a minority interest in the Debtor constitutes wavier and estoppel. Any analysis of equitable estoppel and waiver in New York begins with the seminal decision of *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175 (1982), in which the New York Court of Appeals explained:

> An estoppel rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury. It is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought. (internal quote marks and citations omitted).

*Id.*, 56 N.Y.2d at 184.

As made clear by the Court in *Nassau Trust*, words and deeds can be the talisman for equitable estoppel, a doctrine which recognizes that actions beget reactions and that a party's actual course of conduct has meaning and confers legal rights, even if it conflicts with the precise terms

4

...

of the parties' written contract. *See Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 285-286, 49 N.Y.S.3d 721, 730 (2d Dep't 2017) (" . . . the Kamco parties' persistent and repeated failure to meet minimum purchase requirements, coupled with OTRT's and SEM's continued acceptance of such conduct without any reservation or protest until a few weeks before the expiration of the agreements . . . equitably estops OTRT and SEM from invoking the benefit of the no-oral-waiver provision"); *Carver Federal Sav. and Loan Ass'n of New York v. Glanzer*, 186 A.D.2d 706, 707-708, 588 N.Y.S.2d 905, 907 (2d Dep't 1992) (citing *Nassau Trust* with approval, and acknowledging that "in light of the bank's concession that it mistakenly believed that the term of the mortgage loan would be 20 years, and in light of the proof that the bank represented to the original mortgagors that the term of the loan would be 20 years, we also conclude that the defendants' affirmative defense based on equitable estoppel has merit").

Although estoppel and waiver are often used interchangeably, the two doctrines are distinct. As the Court explained in *Nassau Trust,* "[w]hile estoppel requires detriment to the party claiming to have been misled, waiver requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Trust*, 56 N.Y.2d at 184.

The conduct of the Current Lender in not declaring a default by reason of the known involvement of the New Investors in the Debtor can and should provide a proper basis for invoking the doctrine of waiver. *See U.S. Bank Nat'l Ass'n v. Kobernick*, 454 Fed. App'x 307, 315 (5th Cir. 2011) (holding that bank waived right to declare transfer of the lender's security interest an event of default where it "knew it had that right; and its intentional conduct in withholding written consent [to the transfer], but refunding tax escrow payments as if it had approved the conveyance . . . was inconsistent with its right to declare a default."); *Massachusetts Mut. Life Ins. Co. v.*

5

*Transgrow Realty Corp.*, 101 A.D.2d 770, 771 (1st Dep't 1984) ("The fact that plaintiff allowed the lapse of a substantial period of time without attempting to enforce the mortgage may have encouraged the mortgagor to expend significant sums of money, or take other action in reliance thereon, such as would create a situation of waiver . . . ."); *In re Kaplan*, 186 B.R. 871, 878 (Bankr. D.N.J. 1995) (applying New York law and giving effect to a waiver to enforce a guarantee and negating the consequences flowing from a default, declaring: "When there is a waiver of default, there is also a waiver of those rights attendant to the default (i.e. the right to accelerate and foreclose).").

Moreover, by failing to raise the purported default in its foreclosure complaint, the Current Lender is now judicially estopped from alleging that an incurable default bars confirmation of the Debtor's Plan providing for a cure and reinstatement. Judicial estoppel is an equitable doctrine developed by the Courts to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *See*, *New Hampshire v. Maine,* 532 U.S. 742, 749–51, 121 S.Ct. 1808 (2001).

Judicial estoppel applies when (i) a party's position is "clearly inconsistent" with a prior position; (ii) the former position has been adopted by the court in some way; and (iii) the party asserting the inconsistent positions would derive an unfair advantage or the opposing party has suffered an unfair detriment. *In re Adelphia Recovery Trust*, 634 F.3d 678, 695-696 (2d Cir. 2011).

Finally, the Current Lender should be barred from asserting either the non-monetary default or, indeed, any monetary defaults as well under equitable principles because of the Covid-19 pandemic. On May 7, 2020, New York's Governor Andrew Cuomo issued Executive Order 202.28 ("EO 202.28") which provides, in relevant part:

> There shall be no initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of

>any residential or commercial mortgage, for nonpayment of such mortgage, owned or rented by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the Covid- 19 pandemic for a period of sixty days beginning on June 20, 2020.

N.Y. Exec. Order No. 202.28.

Through subsequent orders, the moratorium on enforcement of commercial mortgages was extended through February 26, 2021. *See,* N.Y. Exec. Order Nos. 202.48, 202.81, 202.92.

The imposition of default rate interest beginning in October 2020 violates the spirit, if not also the letter of the Governor's Executive Orders. Moreover, the commencement of the foreclosure action by the Current Lender on February 23, 2021, while the Executive Orders were still in full force and effect, is a clear violation of the Orders.

It has long been recognized that, in certain instances, a declaration of default or acceleration of debt can be set aside for equitable reasons. *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577 (1979) ("in rare cases, agreements providing for the acceleration of the entire debt upon the default of the obligor may be circumscribed or denied enforcement by utilization of equitable principles."). The Debtor submits that this doctrine should be applied in this case on two equitable grounds – the impact of the Covid-19 pandemic, and the fact that the involvement of the New Investors did not adversely affect the rights of Investors Bank or the Current Lender.

There are not, as yet, a significant number of decisions exploring the impact of the pandemic on mortgages and other contracts. However, in a case arising out of the economic depression of 1907, the First Department invoked equity to set aside the acceleration of a mortgage. *See*, *Germania Life Ins. Co. v. Potter*, 124 A.D. 814 (1st Dep't 1908) ("The court can take judicial notice of the fact that during October, 1907, there was great financial depression and disturbance. What might be deemed reasonable at one time might be wholly unreasonable at another time under

a different situation. The foreclosure of a mortgage is equitable in its nature, although based on legal rights, and it is the province of a court of equity to see to it that a party invoking its relief shall have dealt fairly, before relief is given. Under the circumstances of this case, it is very evident that this respondent did not deal fairly with the appellant, and that it took a technical and unconscionable advantage of the situation.").

The Debtor respectfully submits that, given the tremendous upheaval caused by the pandemic, as recognized by the Governor in issuing his Executive Orders, it was inequitable for Investors Bank, and later the Current Lender, to accelerate the debt. As such, the cure should be predicated upon payment of the contract rate of interest.

Another equitable principle at play is whether the alleged default is so immaterial as to constitute an unenforceable penalty leading to an inequitable forfeiture. In this respect, the instant case is quite similar to the facts in *Tunnell Pub. Co. v. Straus Commc'ns, Inc.*, 169 A.D.2d 1031, 1032 (3d Dep't 1991), where the Court held that:

> where the breach asserted as the basis for the acceleration is trivial or inconsequential, the forfeiture may be viewed as an unconscionable penalty and equitable principles come into play **575 (*see, Fifty States Mgt. Corp. v. Pioneer Auto Parks,* 46 N.Y.2d 573, 577, 415 N.Y.S.2d 800, 389 N.E.2d 113). Each case must be decided on its own particular facts (*Home Sav. Bank of Upstate N.Y. v. Baer Props.,* 92 A.D.2d 98, 100, 460 N.Y.S.2d 833). Defendants' factual allegations, if true, establish that plaintiffs have sustained no damages, that the security bargained for by plaintiffs has not been impaired, that the successor obligor on the note is a viable, financially stable entity carrying on the business of the original obligor and that the essential part of the bargain—timely payment of the installments due under the note—has been and is being satisfied. Plaintiffs contend that since they bargained for and SCI executed a note providing for acceleration upon SCI's dissolution and such dissolution has occurred, the note must be enforced according to its terms without regard to whether the dissolution had any actual impact on plaintiffs. We disagree and conclude that defendants' allegations are sufficient to require denial of plaintiffs' motion for summary judgment since equitable principles may preclude enforcement of an unconscionable penalty.

Here, as in *Tunnell*, the involvement of the New Investors did not cause either Investors Bank or the Current Lender to sustain any damages, did not impair or devalue the collateral, and, indeed, improved the financial ability of the Debtor to operate. Thus, under the equitable principles acknowledged in *Fifty States Mgmt. Corp., supra*, the purported incurable default should be disallowed as an unenforceable penalty.

### B. The Debtor is Not Required to Pay Post-Petition Default Interest

A cure and reinstatement analysis in the Second Circuit begins with the seminal case of *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir. 1982), where the Court held that "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified."

The Debtor's proposed cure follows the Hon. Elizabeth Stong's decision in *In re Moshe*, 567 B.R. 438 (Bankr. E.D.N.Y. 2017), insofar as it requires the payment of all pre-petition default interest to the extent allowed. However, the creditor in *Moshe* was oversecured, while the Current Lender is undersecured. The Debtor submits that this creates a very important distinction and the obligations for cure and reinstatement (post-petition) are different for undersecured creditors consistent with all of the case law under *Taddeo* relating to the nullification of the consequences of the prior default.

The issue of whether the cure and reinstatement provisions of Section 1124 require payment of post-petition default interest in connection with an undersecured mortgage has not been the subject of substantial case law or commentary. There is no doubt that an oversecured creditor is entitled to recover post-petition default interest as recognized in *Moshe*, as well as in other cases in this Circuit, including *In re General Growth Properties, Inc.,* 451 B.R. 323 (Bankr.

9

S.D.N.Y. 2011). *See also, In re DePietto,* 2021 WL 3287416 (S.D.N.Y. 2021) (remanding to Judge Drain to determine whether interest on pre-petition interest is allowed).

By the same token, in making his findings in *General Growth*, Judge Groper referred back to his earlier decision in *In re Northwest Airlines Corp.*, 2007 WL 3376895 (Bankr. S.D.N.Y. 2007), which denied post-petition default interest for an undersecured creditor where, as here, general creditors would be prejudiced.[1]

The prejudice to the Debtor can also be considered. Thus, post-petition default interest was also denied under a Section 1124 cure and reinstatement in *In re Schatz*, 426 B.R. 24, 28 (Bankr. D.N.H. 2009), notwithstanding that the creditor was oversecured on the ground that awarding "default interest for the post-petition arrearage would go against the Bankruptcy Code's commitment to providing debtors with a 'fresh start.'"

Applying these principles, the cure should be limited to pre-petition default interest only, to the extent allowed.

### C. The Plan Should be Confirmed

Once the Court fixes the amount of the cure, the Debtor bears the burden of proof on all other elements necessary for confirmation of the Plan. *See, In re Fur Creations by Varriale, Ltd.,* 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995). To satisfy this burden, the Debtor must show by a preponderance of the evidence that the Plan complies with the applicable provisions of the Bankruptcy Code. *See, In re Charter Commc'ns,* 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (holding that the plan proponent bears the burden of establishing compliance with the factors set forth in § 1129 by a preponderance of the evidence).

---

[1] *But see*, *In re Sultan Realty, LLC*, 2012 WL 6681845 (Bankr. S.D.N.Y. Dec. 21, 2012), canvasing the law to impose post-petition default interest, and distinguishing *Northwest Airlines* because, among other things, the creditor there was undersecured.

10

Section 1129(a) of the Bankruptcy Code provides that a court shall confirm a chapter 11 plan if all of the requirements of § 1129(a)(1) through (a)(16) of the Bankruptcy Code are satisfied. *See* 11 U.S.C. § 1129(a). Here, the Plan should be confirmed because the Debtor has satisfied each of the applicable requirements of § 1129 of the Bankruptcy Code.

**(1)     Plan Compliance with the Code**

**(a)     Classification of Claims and Interests**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the "applicable provisions" of the Bankruptcy Code. In determining whether the Plan complies with § 1129(a)(1), the Court must consider § 1123(a) of the Bankruptcy Code, which sets forth certain elements that a plan must contain, and § 1122 of the Bankruptcy Code, which governs the classification of claims and interests. *See, Kane v. Johns-Manville Corp.,* 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in this subsection to mean provisions of Chapter 11 ... such as section 1122 and 1123."); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan.").

Section 1123(a)(1) of the Bankruptcy Code requires that a plan classify all claims and all interests, and that such classification comply with § 1122 of the Bankruptcy Code. *See,* 11 U.S.C. § 1123(a)(1). A plan proponent has significant flexibility in classifying claims under § 1122 of the Bankruptcy Code. Courts also are afforded broad discretion in approving a plan proponent's classification scheme and should consider the specific facts of each case when making such a determination. *See, In re 500 Fifth Ave Assocs.,* 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (the proponent of a chapter 11 plan has "considerable discretion to classify claims and interests

11

according to the facts and circumstances of the case ..."); *see, also, In re Jersey City Med. Ctr.,* 817 F.2d 1055, 1060-61 (3d Cir. 1987) (observing that "Congress intended to afford bankruptcy judges broad discretion [under § 1122] to decide the propriety of plans in light of the facts of each case.").

Courts have routinely upheld separate classifications of various groups of claims and interests where there is a reasonable basis for such separation. *See, e.g., Frito-Lay v. LTV Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis). In so doing, courts have emphasized that the Bankruptcy Code prohibits only the identical classification of dissimilar claims, and nowhere requires the same classification for claims that may share some attributes. *See, In re Drexel Burnham*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together ...."); *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) (stating "a debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class").

The Plan properly classifies all claims. The secured claim of the Current Lender is clearly distinct from the claims of unsecured creditors, particularly for purposes of cure and reinstatement, and therefore should be separately classified. Moreover, the Debtor's separate classification of the claim held by Thor is not improper, given its status as a judgment lien creditor.

Accordingly, the Plan's classification scheme is factually and legally reasonable. The Debtor submits that the Plan satisfies the requirements of §§ 1122 and 1123(a)(1) of the Bankruptcy Code.

### (b)  Other provisions of Section 1123(a) – Mandatory Plan Provisions

Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). Here, the Plan satisfies the requirements of § 1123(a)(2) of the Bankruptcy Code.

Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). In this case, the treatment of the impaired classes is laid out in the Plan, meeting the requirements of this Section.

Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The Plan satisfies this requirement in that all holders of allowed Claims in each Class are being treated equally. Accordingly, the Plan satisfies the requirements of § 1123(a)(4) of the Bankruptcy Code.

Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. *See*, 11 U.S.C. § 1123(a)(5). The cure and reinstatement of the Current Lender's secured claim pursuant to Section 1123(a)(5)(G), to be funded by the New Value Contributions to be made by the New Investors, meets this requirement.

Section 1123(a)(6) relates to the stock of corporate debtors and is not applicable to this case.

Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions with respect to the manner of selection of any officer, director or trustee, or any successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1123(a)(7).

There is nothing in the Plan which is inconsistent with the interests of creditors, equity interest holders or public policy. Therefore, the Plan satisfies the requirements of § 1123(a)(7) of the Bankruptcy Code.

### (c) Provisions of Section 1123(b) – Permissive Plan Provisions

#### (i) Treatment of Claims and Interests

Consistent with § 1123(b)(1) of the Bankruptcy Code, the Plan leaves unimpaired the secured claim of the Secured Lender, by providing for the cure and reinstatement of the Mortgage Note and, therefore, the Plan satisfies § 1123(b)(1) of the Bankruptcy Code.

#### (ii) Assumption of the Leases and the Union Contract

Consistent with § 1123(b)(2) of the Bankruptcy Code, the Plan provides that all unexpired leases of residential and commercial tenants are being assumed by the Debtor under § 365 of the Bankruptcy Code. The Plan also provides for the assumption of the Debtor's labor contract with the Union in compliance with this Section.

#### (iii) Inapplicable Sections

The Plan does not contain any of the permissive provisions which may be included in a plan consistent with § 1123(b)(3), (4), (5), or (6) of the Bankruptcy Code.

### (2) Debtor's Compliance with the Code

Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan must comply with the applicable provisions the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(2). The principal purpose of this section is to ensure that a plan proponent has complied with the requirements of § 1125 in the solicitation of acceptances of the plan. *See, In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). Section 1125 ensures that parties in

interest are provided with sufficient information so they may make an informed decision on whether to approve or reject the plan. *See, In re Momentum Mfg. Corp.,* 25 F.3d 1132, 1136 (2d Cir. 1994).

Here, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including the provisions of § 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules.

The Debtor has obtained approval of its Amended Disclosure Statement and served each creditor and party in interest with the copies of the Plan, Amended Disclosure Statement and ballot, pursuant to this Court's January 27, 2022 Scheduling Order (ECF No. 65),

Furthermore, the Debtor has complied with all other orders of the Court entered during the pendency of this Chapter 11 case and with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules with respect to postpetition disclosure and solicitation of acceptances of the Plan.

**(3)    Good Faith**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Although not defined in the Bankruptcy Code, "good faith" has been interpreted by courts to include: (i) the debtor's "legitimate and honest purpose" in proposing the plan and "reasonable hope of success" *(In re Source Enters., Inc.,* Case No. 06-11707, 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007)); (ii) a showing that the plan was proposed with "honesty and good intentions" *(Kane v. Johns-Manville Corp.,* 843 F.2d 636, 649 (2d Cir. 1988) (citations omitted)); and (iii) the existence of "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code" *(In re Madison Hotel Assoc.,* 749 F.2d 410, 425 (7th Cir. 1984) (citations omitted)). The court must also consider the totality of the circumstances surrounding a plan to determine if it has been proposed in good faith. *See, In re New Valley Corp.,* 168 B.R. 73, 81 (Bankr. D.N.J. 1994).

The Plan was proposed in good faith. The Plan has been conceived and proposed with the "honest purpose" and "reasonable hopes of success" by which "good faith" under § 1129(a)(3) of the Bankruptcy Code is measured. *See, Brite v. Sun Country Dev., Inc. (In re Sun County Dev., Inc.),* 764 F.2d 406, 408 (5th Cir. 1985). Accordingly, the Plan satisfies the requirements of § 1129(a)(3) of the Bankruptcy Code.

**(4)    Payment of Fees**

Section 1129(a)(4) of the Bankruptcy Code requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," either be approved by the Court as reasonable or subject to approval of the Court as reasonable. 11 U.S.C. § 1129(a)(4). No interim compensation has been sought, and the fees of the Debtor's bankruptcy counsel for services and expenses incurred in connection with the case will be the subject of a final application and approval by the Bankruptcy Court.

**(5)    Post-confirmation Management**

Section 1129(a)(5)(A)(i) and (ii) of the Bankruptcy Code require that the plan proponent disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor ... or successor to the debtor under the plan," and require a finding that the "appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A)(i)-(ii).

The Plan specifically provides in Section 4.5 for the post-confirmation management of the Reorganized Debtor.

**(6)    Regulatory Authority**

Section 1129(a)(6) of the Bankruptcy Code requires any governmental regulatory commission having jurisdiction over the rates charged by the post-confirmation debtor in the operation of its business to approve any rate change provided for in the plan. *See* 11 U.S.C. § 1129(a)(6). Because no governmental regulatory commission has jurisdiction over the Debtor, the provisions of § 1129(a)(6) of the Bankruptcy Code are not applicable.

**(7)    Impaired Claims**

The Bankruptcy Code protects creditors and equity holders who are impaired by the Plan and have not voted to accept the Plan through the "best interests" test of § 1129(a)(7). In this case, Class 2 and 3 are impaired. Class 3 voted to accept the Plan, while Class 2 (Thor) did not vote. However, since Thor is receiving more under the Plan than it otherwise would have received in a liquidation under Chapter 7, the Plan complies with the requirements of Section 1129(a)(7).

The provisions of § 1129(a)(8) and (10), which effectively require that the Plan be accepted by at least one of the classes of impaired creditors, without counting insiders, are met because Class 3 (General Unsecured Creditors) voted unanimously to accept the Plan.

**(8)    Administrative Expenses and Priority Claims**

§ 1129(a)(9) contains specific requirements for the treatment of administrative expenses and priority claims. The Plan complies with these requirements by providing that any such expenses and claims will be paid in full on the Effective Date.

**(9)    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code provides that a plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement, commonly known as the "feasibility" standard, usually encompasses two interrelated determinations: (i) the debtor's ability to consummate the provisions of the plan, and (ii) the debtor's ability to reorganize as a viable entity. *See, Johns-Manville, supra,* 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (stating that the definition of feasibility "has been slightly broadened and contemplates whether [a] debtor can realistically carry out its Plan ... and [b] whether the Plan offers a reasonable prospect of success and is workable.").

Here, the Debtor intends to make capital calls to establish the requisite feasibility.

**(10)    Quarterly Fees**

Section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under 28 U.S.C. § 1930 be paid or that the plan provide for their payment on the effective date of the plan. *See* 11 U.S.C. § 1129(a)(12).

The Plan provides that all quarterly fees due to the Office of the U.S. Trustee, and any other administrative expenses, shall be paid on the Effective Date. Moreover, the Plan provides for the continued payment of quarterly fees through the closing of the case. Therefore, the Plan satisfies the requirements of § 1129(a)(12) of the Bankruptcy Code.

**(11)    Remaining Provisions of Section 1129(a)**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continuation of retiree benefits at levels established pursuant to § 1114 of the Bankruptcy Code for the duration of the period that the debtor has obligated itself to provide such benefits. *See,* 11 U.S.C. § 1129(a)(13). The Debtor does not have any "retiree benefits" programs, as such term is defined in § 1114 of the Bankruptcy Code, and, therefore, § 1129(a)(13) of the Bankruptcy Code

is inapplicable. Sections 1129(a)(14) and (a)(15) of the Bankruptcy Code apply only to individual debtors and, consequently, do not apply here. Finally, section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are nonprofit entities or trusts.

**(12)    Only One Plan May be Confirmed**

Section 1129(c) of the Bankruptcy Code provides that "the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144" of the Bankruptcy Code. 11 U.S.C. § 1129(c). Other than the Plan, no plan has been filed in this Chapter 11 case. Accordingly, the requirements of § 1129(c) of the Bankruptcy Code have been satisfied.

**(13)    Plan is Not Principally Designed for the Avoidance of Taxes**

Section 1129(d) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933." 11 U.S.C. § 1129(d).

In this case, the Debtor is current with payment of all taxes, and no taxes are being avoided through the Plan.

**Conclusion**

For all of the reasons set forth herein, the Plan should be confirmed.

Dated:  New York, NY
        March 30, 2022

                     GOLDBERG WEPRIN
                     FINKEL GOLDSTEIN LLP
                     *Attorneys for the Debtor*
                     1501 Broadway, 22nd Floor
                     New York, New York 10036
                     (212) 221-5700

                     By:    /s/ Kevin J. Nash, Esq.