UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re:

975 WALTON BRONX LLC,

                                    Debtor.
-------------------------------------------------------------------X

Chapter 11

Case No.: 21-40487-jmm

**MEMORANDUM DECISION ON THE DEBTOR'S ABILITY TO CURE AND
REINSTATE WALTON IMPROVEMENT GROUP LLC'S LOAN**

Appearances:

Kevin J. Nash, Esq.
J. Ted Donovan, Esq.
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, New York 10036
*Counsel for Debtor*

Benjamin Mintz, Esq.
Justin Imperato, Esq.
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
*Counsel for Walton Improvement Group LLC*

**HONORABLE JIL MAZER-MARINO**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

This decision addresses whether the debtor's plan of reorganization, which deaccelerates mortgage debt, is confirmable. As background, 975 Walton Bronx LLC (the "Debtor") owns an apartment building that is subject to a mortgage held by Walton Improvement Group LLC (the "Lender"). The mortgage secures a claim exceeding $20 million. Pre-petition, the Lender acquired the loan and mortgage from Investors Bank. At the time of the Lender's acquisition, the Debtor was in default by failing to make debt service payments. The Debtor also was in default of loan covenants restricting the transfer of interests in the Debtor. Specifically, the loan agreement required 15-21 Crooke LLC ("Crooke") to be the sole owner of the Debtor and for Benzion Kohn to control Crooke. Prior to the Lender's acquisition of the loan and mortgage, Crooke sold 49.9% of its interests in the Debtor to The J Partners Group ("J Partners"), without notice to, or consent from, Investors Bank.

The Debtor's Amended Plan of Reorganization proposed to cure the monetary default and reinstate the loan terms pursuant to section 1124 of title 11 of the United States Code (the "Bankruptcy Code"). The Lender objected to the plan claiming the Debtor could not reinstate the loan because the Debtor had not, and did not, propose to cure the control covenant default. The Debtor argued that Bankruptcy Code section 1124(2) did not require a cure of nonmonetary defaults. Additionally, the Debtor argued that the Lender was acting in bad faith because it acquired the loan knowing that J Partners owned an interest in the Debtor and for the purpose of calling a default based on the change of control.

On April 7, 2022, the Court rendered a decision that rejected the Debtor's argument that Bankruptcy Code section 1124(2) permitted the plan to cure and reinstate the mortgage without

curing nonmonetary defaults. The Court rejected the Debtor's other arguments as well. However, the Court recognized that under New York law, even if a nonmonetary default could not be cured, a mortgagee could be precluded from accelerating a loan if the mortgagor could establish that the nonmonetary default was unintentional and did not damage the Lender, impair the Lender's collateral, or imperil the future payment of principal and interest.

As set forth below, the breach of the change of control covenant was intentional, damaged the Lender, and makes future payments of principal and interest less certain. Therefore, the Lender is entitled to accelerate the loan under New York law and the Debtor cannot cure and reinstate the Lender's claim absent cure of the nonmonetary default and compliance with Bankruptcy Code section 1124(2).

**JURISDICTION**

The Court has jurisdiction under 28 U.S.C. §§ 157(a), 157(b)(1) and 1334(b), and the Eastern District of New York Standing Order of Reference dated August 28, 1986, as amended by Order dated December 5, 2012. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**VENUE**

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (L).

**BACKGROUND**

**The Property and the Loan Documents**

The Debtor owns 975 Walton Avenue, Bronx, New York (the "Property"), a mixed-use building with 182 residential apartments and five stores. Debtor's Amended Disclosure Statement at 3, ECF No. 58.

3

The Debtor financed the Property's acquisition with a $22,500,000.00 loan (the "Loan") from Investors Bank. In connection with the financing, the Debtor executed and delivered to Investors Bank a Loan Agreement, dated April 1, 2015, a Promissory Note in the principal amount of $22,500,000.00, and a Mortgage Consolidation, Extension and Modification Agreement. Decl. of Justin G. Imperato Ex. A, at 4, Ex. B, at 21, Ex. C, at 65, ECF No. 85.

Loan Agreement sections 2(a), 3(d), and 7(a)(ix) (collectively, the "Control Covenants") concern restrictions to changes of control of the Debtor. Section 2(a) states:

> The Borrower hereby represents and warrants to the Bank (which representations and warranties shall survive until the Loan has been paid in full) that as of the date hereof . . . Benzion Kohn is the managing member of 15-21 Crooke LLC who is the sole member of Borrower.

Decl. of Justin G. Imperato Ex. C, at 67, ECF No. 85.

Section 3(d) states:

> Notwithstanding the foregoing, the Bank may in its non-reviewable discretion and upon such terms and conditions as it determines prudent, consent to a transfer of the legal or equitable ownership of the Mortgaged Property and an assumption of the Loan in conjunction therewith upon the following terms and conditions (a "**Transfer**")
>
> (i) No Event of Default or event or circumstance which, with the passage of time or the giving of notice or both would constitute an Event of Default under any of the Loan Documents shall have occurred and remain uncured at the time the Loan is to be assumed;
>
> (ii) the proposed transferee (the "**Transferee**") shall have executed and delivered to the Bank an assumption agreement . . . evidencing the Transferee's agreement to abide and be bound by the terms of the Loan Documents and shall have provided the Bank with such legal opinions and title insurance endorsements as may be reasonably requested by the Bank;
>
> (iii) The Bank shall have received payment of a transfer processing fee equal to one percent (1%) of the principal amount of the Loan then outstanding (the "**Transfer Processing Fee**") and all costs and expenses incurred by the Bank in connection with the Transfer (including reasonable attorneys' fees and expenses). The Bank may, as a condition to evaluating any requested consent to the Transfer, require that the Borrower or the Transferee post a cash

> deposit with the Bank in an amount equal to the Transfer Processing Fee and the anticipated costs and expenses in connection with the foregoing.

Decl. of Justin G. Imperato Ex. C, at 69-70, ECF No. 85.

> Under section 3(i):

> The Borrower covenant(s) and agree(s) that, until the Loan has been paid in full . . . [t]he Borrower . . . shall maintain 15-21 Crooke LLC as its sole member . . . [and] [n]o equity ownership in the Borrower may be transferred, pledge[d] or encumbered, directly or indirectly, without the prior written consent of the Bank.[1]

Decl. of Justin G. Imperato Ex. C, at 69, 71, ECF No. 85.

Section 7(a)(ix) provides, at the sole option of the Bank, an Event of Default shall occur if there is:

> Except as may be otherwise specifically permitted herein, any change in the ownership of the Mortgaged Property or the equity ownership of the Borrower without the prior written consent of the Bank, which may be granted or withheld in the Bank's sole judgment[.]

Decl. of Justin G. Imperato Ex. C, at 74-75, ECF No. 85.

## The Change of Ownership and Control of the Debtor

When the Debtor entered into the Loan Agreement, the Debtor's sole member was Crooke and Crooke's sole managing member was Benzion Kohn, an individual.  Decl. of Justin G. Imperato Ex. B at 63, ECF No. 85; *see also* May 23, 2022 Tr. 117:19 – 118:13, ECF No. 127.  In January 2018, Crooke transferred 49.99% of its ownership interest in the Debtor to J Partners. May 23, 2022 Tr. 13:19 – 14:15, ECF No. 127.

In April 2020, the Debtor defaulted on the loan by failing to make debt service payments. Amended Decl. of Daniel Wiener ¶ 9, ECF No. 136 ("Wiener Decl.").  The Debtor failed to make payments through the Petition Date.  *Id.*  In August 2020, Investors Bank gave notice of default

---

[1] The Loan Agreement permits certain transfers of equity interests; however, none of those exceptions apply to the transfer here.  *See* Loan Agreement section 3(i).

and acceleration based on the Debtor's failure to make installment payments and failure to provide financial information. Wiener Decl. ¶ 16. On or about October 2020, Investors Bank assigned the Loan to the Lender. Wiener Decl. ¶ 11. In December 2020, the Lender sent the Debtor a second letter of default and acceleration again based on the Debtor's failure to make installment payments commencing with the payment due March 1, 2020. Wiener Decl. ¶ 16.

In February 2021, the Lender commenced a foreclosure action in Supreme Court, Bronx County, Index No. 802465/2021E. Decl. of Larry Jeremias Ex. G, at 70, ECF No. 96. The foreclosure complaint referenced the monetary defaults but did not reference the Control Covenant defaults. *See id.* at 73-85.

**The Bankruptcy Case**

The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 25, 2021. Petition, ECF No. 1. The Debtor remains in possession of its property and continues to manage its assets.

The Lender timely filed a proof of claim asserting a claim of $23,984,121.65 as of the Petition Date, secured by substantially all of the Debtor's assets, including the Property, rents and proceeds from the Property, and proceeds of insurance policies covering the Property. Proof of Claim No. 7-1.

On November 22, 2021, the Debtor filed its amended chapter 11 plan of reorganization and related disclosure statement. Debtor's Amended Chapter 11 Plan of Reorganization, ECF No. 57 (the "Plan"); Debtor's Amended Disclosure Statement, ECF No. 58. Under the Plan, the Debtor intends to cure and reinstate the Loan. Plan at 1. The Debtor calculated that the amount due to cure the pre-petition date arrears to be $1,574,810.00 "(including pre-petition default interest for the period starting with acceleration of the Mortgage on August 31, 2020 up to and including the

Petition Date, hereinafter, the "Cure")."  Plan at 7.  Upon payment of the cure on the Plan's effective date, the terms of the  Loan would be reinstated, including (1) reinstatement of the original maturity date of April 1, 2027; (2) continued payment of interest at a rate of 3.5% per annum, subject to adjustment and recalculation on May 1, 2022; (3) continuation of the Lender's eligibility to receive prepayment fees; and (4) regular payments of principal and interest beginning 30 days after the Effective Date and continuing until maturity on April 1, 2027.  Plan at 7, 8.

Prior to filing the Plan, the Debtor learned the Lender intended to object to the Debtor's cure and reinstatement of the Loan.  Among other things, the Lender claimed the Loan could not be cured and reinstated due to defaults under the Control Covenants.  As such, the order approving the Disclosure Statement provides for a bifurcated confirmation hearing.  Order Approving the Debtor's Amended Disclosure Statement at 3, ECF No. 65.  First, the Court would consider whether the Plan could cure and reinstate the Loan.  *Id.*  If the Court held the Debtor could not confirm a cure and reinstatement plan, the second confirmation hearing would consider the Debtor's alternative treatment of the Lender's claim and all other criteria for Plan confirmation. *Id.*

On April 7, 2022, the Court read a decision into the record.  Apr. 7, 2022 Tr., ECF No. 105.  Among other things, the Court held the Debtor was in default under the Loan Agreement due to the breach of the Control Covenants.  Unless the Debtor cured the default of the Control Covenants, the Plan could not deaccelerate the Loan under Bankruptcy Code section 1124(2). However, notwithstanding the default, the Lender could be precluded from accelerating the Loan under certain equitable principals outlined in *In re Stanhope, LLC.  Id.*  The Court afforded the Debtor the opportunity to prove that, under *Stanhope*, the Lender could not accelerate the Loan. *Id.*

7

On May 11, 2022, the Debtor filed a memorandum arguing that under *Stanhope*, the Lender was precluded from accelerating the indebtedness under the Loan Agreement.  Debtor's Pre-Trial Brief, ECF No. 111.  On May 13, 2022, the Lender filed a pre-trial brief in support of its objection to the confirmation of the Debtor's amended chapter 11 plan.  *See* Lender's Pre-Trial Brief, ECF No. 115.

The Court heard testimony on May 16, 2022, May 23, 2022, and August 2, 2022 from:

- Larry Jeremias who oversees the day-to-day operations at the Property for the Debtor.  May 16, 2022 Tr. 43:4 – 62:24, ECF No. 118; May 23, 2022 Tr. 11:21 – 130:13, ECF No. 127.

- Seema Gruman, a Certified Public Accountant who is responsible for the Debtor's financials, operating statements, and payables.  May 23, 2022 Tr. 132:14 – 161:3; 133:21-22; 134:13-18; 135:11-13, ECF No. 127.

- Aaron Jungreis, a twenty percent investor in J Group.  Aug. 2, 2022 Tr. 6:20 – 36:15, ECF No. 157.

- Daniel Wiener, the Senior Managing Director for the Lender.  Aug. 2, 2022 Tr. 41:7 – 107:7, ECF No. 157; Wiener Decl. at 24.

The Debtor and the Lender filed post-trial briefs on August 31, 2022.  Lender's Post-Trial Brief, ECF No. 154; Debtor's Post-Trial Brief, ECF No. 156.

### APPLICABLE LEGAL STANDARDS

Although New York Courts have held that a mortgagee has the absolute right to accelerate a mortgage upon the mortgagor's default, other courts have held that equitable considerations may preclude acceleration notwithstanding a mortgagor's default.  *Compare Graf v. Hope Bldg. Corp.*, 254 N.Y. 1 [1930] *with In re 53 Stanhope LLC*, 625 B.R. 573 (Bankr. S.D.N.Y. 2021).

**I.**    ***Under New York State Law Mortgagees are Entitled to Enforce Acceleration Clauses Absent Some Element of Fraud, Exploitive Overreaching, or Unconscionable Conduct.***

In *Graf v. Hope Bldg. Corp.*, the New York Court of Appeals permitted a mortgagee to accelerate mortgage indebtedness notwithstanding that the default was de minimis and

unintentional and the mortgagee offered a prompt and complete cure.  *See Graf*, 254 N.Y. at 3-7. In *Graf*, the 10-year mortgage was payable in quarterly installments of approximately $6,100.00. *See id.* at 7.  Due to innocent clerical errors, one quarterly payment was short approximately $400.00.  *See id.* at 8.  Mortgagee accelerated the loan one day after the expiration of the grace period and rejected mortgagor's tender of a cure payment, notwithstanding the cure payment was delivered the same day the mortgagee advised mortgagor of the default and acceleration.  *See id.*

The trial court dismissed the mortgagee's foreclosure complaint finding that the unpaid interest was less than one-tenth the amount due, the plaintiff had availed himself of the proceeds of the payment, and, as a court of equity, it enjoyed the power to relieve a mortgagor from a mere technical default in payment where it was not willful.  *Graf v. Hope Bldg. Corp.*, 132 Misc. 352, 354 (Sup. Ct. N.Y. Cty. 1928), aff'd, 226 App. Div. 787, 787 (1st Dep't. 1929).

The Court of Appeals reversed, and stated "if, from the mere negligence of the mortgagor in performing his contract, he suffers the whole debt to become due and payable, according to the terms of the mortgage, no court will interfere to relieve him from the payment thereof according to the conditions of his own agreement."  *Graf*, 254 N.Y. at 5.  The Court reasoned that "the interests of certainty and security in real estate transactions forbade the court from considering equitable consideration in determining the enforceability of an acceleration clause 'in the absence of fraud, bad faith or unconscionable conduct.'"  *Id.* at 6.

In his dissent, Chief Judge Cardozo opined that acceleration clauses in mortgages were no different than default clauses in any other contract and, therefore, subject to equitable consideration.  Chief Judge Cardozo opined:

> Equity declines to give effect to a covenant, however formal, whereby in the making of a mortgage, the mortgagor abjures and surrenders the privilege of redemption . . . Equity follows the law, but not slavishly nor always.  If it did, there could never be occasion for the enforcement of equitable doctrine.  To all this,

acceleration clauses in mortgages do not constitute an exception.  They are not a class by themselves, removed from interference by force of something peculiar in their internal constitution.

*Id.* at 8-9.

While Chief Judge Cardozo acknowledged that, in general, acceleration clauses should be enforced as written, he believed the Court should not permit the enforcement of the acceleration clause in the *Graf* case because it would work a hardship approaching the oppression of a penalty. *See id.* at 9, 14-15.

In *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 575 [1979], the New York Court of Appeals again examined whether equity should prevent the enforcement of an acceleration clause.  In *Fifty States*, a 20-year lease permitted the landlord to accelerate all rent due under the lease upon a payment default.  *See id.* at 57.  The tenant mailed the fourth monthly rent payment under a 20-year lease to the wrong address.  Landlord informed tenant of the default, however tenant failed to cure and failed to pay the following month's rent.  Landlord sued seeking all rent due under the 20-year lease.  *See id.*

The Second Circuit Court of Appeals noted that "equity will often intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach."  *Id.* at 576-77 (citing Ch. J. Cardozo's dissent in *Graf* and other authority).  Additionally, equity could intervene to prevent unconscionable overreaching where a good faith mistake has been promptly cured and there is no prejudice to the non-defaulting party.  *See id.* at 577.

As the failure to timely tender the fourth monthly rent payment was due to clerical error, equitable relief could have been available if the tenant immediately cured the default and landlord was not prejudiced.  *See id.* at 578-79.  However, the tenant did not promptly cure.  Moreover, the covenant to pay rent at a specific time was an essential part of the bargain as it represented the

consideration to be received by the landlord for permitting the tenant to remain in possession of the landlord's property. *Id.* Therefore, "[a]bsent some element of fraud, exploitive overreaching or unconscionable conduct on the part of the landlord to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties." *Id.*

## II.     *Under New York State Law, a Court Exercising its Equitable Powers May Preclude a Mortgagee's Enforcement of an Acceleration Clause Triggered by a Nonmonetary Default.*

In *In re Stanhope,* the Court acknowledged that acceleration clauses are strictly enforced upon a monetary default. The Court, however, observed that "New York has long recognized broader equitable exceptions . . . with respect to acceleration and non-monetary defaults" and would permit acceleration based on a nonmonetary default only if (1) the lender has suffered actual damages as a result of the default; (2) the default has impaired the lender's security, such as the collateral securing the debt; and (3) the default makes the future payment of principal and interest less likely. Courts also consider whether the default was inadvertent. *In re 53 Stanhope LLC*, 625 B.R. at 584 (citing *Karas v. Wasserman*, 91 A.D.2d 812, 812-13 (3d Dep't. 1982); *see also Empire State Bldg. Assocs. v. Trump Empire State Partners*, 245 A.D.2d 225, 226-28 (1st Dep't. 1997); *Tunnell Pub. Co. v. Straus Commun., Inc.*, 169 A.d.2d 1031, 1031-32 (3d Dep't. 1991); *Blomgren v. Tinton 763 Corp.*, 18 A.D.2d 979, 979-80 (1st Dep't. 1963); *100 Eighth Avenue Corp. v. Morgenstern*, 4 A.D.2d 754 (2d Dep't. 1975); *Rockaway Park Series Corp. v. Hollis Automotive Corp.*, 206 Misc. 955, 957-58 (Sup. Ct. N.Y. Cty. 1954); *see also* Michael Gusto, Note: Mortgage Foreclosure for Secondary Breaches: A Practitioner's Guide to Defining "Security Impairment," 26 Cardozo L. Rev. 2563 (May 2005)).

## DISCUSSION

In its April 7, 2022 decision, this Court determined that Crooke's transfer of its interests in the Debtor violated the Control Covenants and the Debtor was in default under the Loan Agreement. The Court also held, per the *Stanhope* decision, the default was a nonmonetary default, and the Lender could not accelerate the loan unless (1) the Lender suffered actual damages as a result of the default; (2) the default impaired the Lender's security; and (3) the default makes the future repayment of the loan less likely. The Court held the burden of proof was on the Debtor to establish all three prongs of the *Stanhope* test. Apr. 7, 2022 Tr. 27:18 – 27:19, ECF No. 105.

Lender contends the Court erred in applying the *Stanhope* legal standard and, per the *Fifty States* decision, the Lender should be permitted to accelerate the Loan unless the Debtor can prove the Lender engaged in fraudulent, exploitive, overreaching, or unconscionable conduct.

The question of which standard to apply is academic because, under either standard, the Lender is within its rights to accelerate the loan based on the Debtor's default under the Control Covenants.

### A. *The Lender Did Not Engage in Fraudulent, Exploitative, Overreaching, or Unconscionable Conduct.*

The Debtor claims the Lender's purchase of the Note and Mortgage for the sole purpose of foreclosing on the Property was fraudulent, exploitive, overreaching, or unconscionable conduct. Daniel Wiener, the Lender's Senior Managing Director, admits the Lender purchased the note from Investors Bank with the intention of having the loan paid in full or obtaining ownership of the Property. Wiener Decl. ¶ 7 ("From time to time, [the Lender would] acquire matured and distressed loans for such properties with the goal of taking ownership of the property if the loan is not repaid in full."); Wiener Decl. ¶ 14 ("The Payment Defaults and many of the Covenant Defaults existed at the time Lender acquired the loan and were known to the Lender at

such time."). Daniel Wiener implies that the Lender purchased the note because the Debtor was owned directly by Crooke and controlled by Benzion Kohn. Wiener Decl. ¶ 12 ("Crooke was identified [in the loan documents] as the owner of the borrower, Benzion Kohn, his wife, and family trusts were identified as the ultimate owners of Crooke, and Benzion Kohn was identified as the controlling managing member of Crooke."). Daniel Wiener, however, makes no claim the Lender investigated whether Benzion Cohen and Crooke continued to own and control the Debtor at the time the Lender acquired the Loan, which was five years after the loan was made. Wiener Decl. ¶ 11 ("On October 30, 2020, the Lender purchased the Investors Bank loan and thereby acquired an assignment of the Loan Documents from Investors Bank pursuant to the Transfer Documents."). Further, Daniel Wiener makes no claim that the Lender had no notice or knowledge that Crooke conveyed interests in the Debtor to J Partners.

Assuming the Lender knew of the Control Covenant default, its acquisition of the Loan to accelerate and foreclose the mortgage is not fraudulent, exploitative, overreaching, or unconscionable. Rather, it is a legitimate exercise of a mortgage assignee's rights. *See, e.g.*, *In re Downtown Athletic Club of New York City v Caspi Development Corp.* (*In re Downtown Athletic Club*), No. 98 B 41419 JLG, 1988 WL 898226, at *11 (Bankr. S.D.N.Y. Dec. 21, 1998) (mortgagees claims for unconscionability, breach of the implied covenant of good faith and fair dealing failed notwithstanding proof that creditor (1) knew debtor was in default prior to purchasing mortgage; (2) declared a default and sought to foreclose the day it purchased the mortgage; and (3) knew that commencing foreclosure action would chill debtor's prospects of obtaining financing to cure the defaults); *In re 139-141 Owners Corp.*, 313 B.R. 364, 369 (Bankr. S.D.N.Y. 2004) (creditor that purchased mortgage to put debtor in default entitled to interest at default rate).

The Debtor also claims that Investors Bank engaged in conduct that was fraudulent, exploitative, overreaching, or unconscionable by failing to grant the Debtor a forbearance, or to permit the Debtor to negotiate to purchase the Loan. *See* May 23, 2022 Tr. 41:8-9, ECF No. 127 ("[A]s many times as we requested [a forbearance], we got denied, where everybody else was easily getting a forbearance."); May 23, 2022 Tr. 42:9-10, ECF No. 127 ("[Investors Bank] would not help in any way, shape or form help us make a forbearance and make payments."); May 23, 2022 Tr. 42;19-20, ECF No. 127 ("[W]e were advised that the bank specifically does not want to work with us."). The Debtor, however, does not deny that at the time it was seeking a forbearance, it was already in default of the Control Covenants, had not provided notice of the transfer of interests from Crooke to J Partners, and had failed to make any debt service payments for many months. Further, the Debtor does not contend that Investors Bank had any obligation to offer a forbearance or to negotiate a sale of the note to the Debtor.

Accordingly, the Debtor has not satisfied its burden that the Lender or Investors Bank engaged in conduct that was fraudulent, exploitative, overreaching, or unconscionable.

**B.   *The Debtor Has Not Satisfied the Stanhope Test.***

The burden is on the Debtor to prove all elements under the *Stanhope* test*. Cf. JPMorgan Chase Bank, N.A. v. Charter Commc'ns* (*In re Charter Commc'ns*), 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (although the party objecting to reinstatement bears the burden of producing proof of the occurrence of defaults, the plan proponent bears the burden of establishing compliance with Bankruptcy Code section 1129); *In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) ("The proponent of a proposed plan bears the burden of proving essential elements of confirmation by a preponderance of the evidence."). As set forth below, the Debtor has failed to carry its burden.

1. ***The Lender Suffered Actual Damages Due to Change of Control Covenant.***

a. ***The Debtor's Failure to Make Debt Service Payments.***

The Lender claims it suffered actual damages from the Control Covenant defaults because the Debtor's new management failed to make debt service payments despite having funds to do so.  The parties do not dispute the Debtor failed to make debt service payments from April 2020 through the Petition Date despite having the cash to do so.  *See* May 23, 2022 Tr. 59:2-4, ECF No. 127; May 23, 2022 Tr. 116:24 – 117:2, ECF No. 127 (Mr. Jeremias testified the Debtor made no debt service payments from April 2020 through the Petition Date); Aug. 2, 2022 Tr. 25:15 – 27:4, ECF No. 157 (Mr. Jungreis testified the Debtor did not make debt service payments despite having sufficient cash on hand); May 23, 2022 Tr. 141:12 – 142:19, ECF No. 127; May 23, 2022 Tr. 154:21 – 155:1, ECF No. 127 (Ms. Gruman testified the Debtor had the ability to make at least some debt service payments as Debtor had a positive cash balance of net income of as much as $922,000.00 at the end of 2020).

The Debtor claims it stopped making mortgage payments because other New York investors were receiving forbearance agreements from lenders and the Debtor assumed it would receive a forbearance from Investors Bank.  August 2, 2022 Tr. 14:2-9, ECF No. 157.  The Debtor's subjective belief it would obtain a forbearance explains the missed payments but does not alter the fact that Investors Bank (and subsequently the Lender) was damaged by the payment default.  The Debtor also implies the change in control did not damage the Lender because the Debtor's prior management would have stopped paying debt service as well; however, that is speculation.

b. ***The Debtor's Failure to Pay Real Estate Taxes and Water Bills.***

The Lender claims it suffered damages because J Partners failed to pay taxes and water charges to preserve the Property.  Wiener Decl. ¶ 44.  Mr. Jeremias contends the water bills went

unpaid because Benzion Kohn failed to disclose the overdue amounts to J Partners.  May 23, 2022 Tr. 14:5-11, ECF No. 127 ("[P]ost-closing we found out that there was more outstanding bills which we weren't aware  of which weren't disclosed to us which were taxes, water  bills and other bills[.]").   Mr. Jeremias claims that after J Partners acquired the interests in the Debtor, J Partners lent money to Benzion Kohn to pay those taxes and water charges.  *Id.* (post-closing J Partners loaned an  additional $550,000.00 to pay water bills, taxes, and other bills); May 23, 2022 Tr. 70:20-21, ECF No. 127 ("We did a loan for 550 because we found out about water bills.").  Despite the loan, the taxes and water bills went unpaid.  Mr. Jeremias gave no explanation why J Partners (1) loaned money to Benzion Kohn to pay water and tax bills instead of paying the bills directly; (2) trusted Benzion Kohn to pay the water and tax bills when they believed Benzion Kohn was inept, financially desperate, and dishonest in failing to disclose the tax and water bills pre-closing; or (3) failed to take effective action to compel Benzion Kohn to use the loan proceeds to pay the outstanding tax and water bills.

That J Partners erroneously trusted Benzion Kohn to make the payments explains why the taxes and water bills were not paid but does not obviate the Lender's damages; rather, J Partners' actions evidence J Partners' lack of care or dubious business judgment.

### c.   *The Debtor's failure to Escrow Fire Insurance Proceeds.*

The Lender also may have been damaged by the Debtor's failure to escrow fire insurance proceeds.  Mr. Jeremias admitted J Partners did not escrow the insurance proceeds and probably deposited the funds into the Debtor's operating account.  May 23, 2022 Tr. 108:10-12, ECF No. 127.  Mr. Jeremias claimed the insurance proceeds were used to make repairs to the Property but have not been used to repair the apartment in which the fire occurred.  May 23, 2022 Tr. 108:20-25, ECF No. 127.  He testified he had not repaired the apartment because he had not yet received consent from the Lender, albeit he relied on counsel to request the consent and cannot know if

16

such request was made. May 23, 2022 Tr. 109:1-24, ECF No. 127. Notwithstanding Mr. Jeremias' testimony that insurance proceeds were used to repair the Property, the Debtor's failure to escrow the insurance proceeds (whether with Investors Bank or at any other bank) impaired the Lender's interests in the insurance proceeds and the Lender's ability to ensure the proceeds were used to remedy Property damage created by the fire.

### 2.   *The Control Covenant Default Damaged the Lender's Collateral.*

The Debtor argues the Control Covenant breaches did not damage the Lender or its collateral and, in fact, benefitted Lender. Mr. Jeremias testified that Benzion Kohn had no real estate experience and J Partners' involvement with the Property added credibility. May 23, 2022 Tr. 53:13-18, ECF No. 127. Mr. Jeremias testified that after J Partners got involved, he and his managers met with tenants, made a list of needed repairs and maintenance, and renovated and marketed vacant units resulting in an income in rents and a five percent increase in net operating income in each of 2018, 2019, and 2020. May 23, 2022 Tr. 20:9-19; 21:7-9; 29:23 – 31:12, ECF No. 127.

Further, Mr. Jeremias implies that deficiencies in the Property's economic performance and the Debtor's failure to make debt service payments notwithstanding improved performance were not caused by J Partners' management but are attributable to New York City's actions or Covid's impact. For example, Mr. Jeremias testified that J Partners planned to increase revenue by adding thirty additional units to the Property. J Partners' plan, however, was stymied by New York City, which conditioned the building permits on receipt of certificates of non-harassment from all tenants. May 23, 2022 21:6-24, ECF No. 127. Mr. Jeremias added that shortly after J Partners acquired the Property, New York City increased real estate taxes dramatically and implemented new regulations that prohibited rent increases, which diminished the Property's profitability. May 23, 2022 Tr. 21:25 – 22:13, ECF No. 127.

Although the Debtor's view of its management skills is subjective, there does not appear to be evidence that the Debtor's new management damaged the Lender's collateral.

### a.  *Increase in Building Violations Not Attributable to the Debtor.*

The Lender claims the Property was damaged by J Partners' management because serious building violations increased after J Partners took control of the Property.  *See* May 23, 2022 Tr. 7:24 – 8:20, ECF No. 127.  The Debtor denies that any building violations resulted from J Partners' management and argues that any increase in building violations was due to other reasons.  First, the Debtor claims Benzion Kohn allowed the building to fall into disrepair in anticipation of its sale.  May 23, 2022 TR. 16:4-9, ECF No. 127.  Second, the Debtor claims that tenants would not permit maintenance workers to enter their apartments due to Covid.  May 23, 2022 Tr. 48:1-7, ECF No. 127.  Third, the Debtor claims that New York City increased enforcement of violations, especially lead paint violations.  May 23, 2022 Tr. 115:3-15, ECF No. 127.

Although the evidence shows an increase in building violations after J Partners took control, the evidence does not establish that J Partners' management caused an increase in building violations.

### b.  *The Debtor's Management was Not Negligent.*

Next, the Lender claims its collateral was impaired due to J Partners' negligent management.  J Partners hired Cedarbridge Management to manage the Property.  Cedarbridge Management is managed by Mr. Jeremias and Moe Greenzweig.  May 23, 2022 Tr. 88:7 – 89:17, ECF No. 127.  The Lender claims Cedarbridge Management rarely visited the Property.  Wiener Decl. ¶ 37 ("Following the Petition Date, I personally toured the property with Mr. Jeremias and Juda Stern . . . [at which point] Mr. Jeremias told me that it was either his first or second time visiting the Property since January 2018 and that he did not regularly visit[.]").  However, Mr.

Jeremias testified that members of J Partners visited the Property frequently. May 23, 2022 Tr. 123:20-25, ECF No. 127.

The evidence does not establish that management is neglecting the Property.

### 3. *The Default Makes the Future Payment of Principal and Interest Less Likely.*

#### a. *The Debtor Paid Insiders Instead of Paying Debt Service.*

The Lender claims J Partners made distributions to insiders that were repayments of capital contributions instead of paying debt service. The Lender claims that practice indicates that J Partners' control of the Debtor imperils the future payment of principal and interest. Lender's Post-Trial Brief at 16, ECF No. 154.

Mr. Jeremias testified that the payments to insiders were justified because they were repayments of short-terms loans. May 23, 2022 Tr. 56:3-17, ECF No. 127. Mr. Jeremias testified that mortgage payments were due the 15th of each month but tenants tended to pay rent at the end of the month. May 23, 2022 Tr. 55:19-25, ECF No. 127. As a result, the Debtor was unable to make monthly mortgage payments:

> So we would put up the money from entities that we kind of controlled, that we managed, that we had an understanding that, you know, sometimes this property is on the lower end and needed help. So we would give a short-term loan. And as soon as the money would come back, we would put the money back.

May 23, 2022 Tr. 56:4-9, ECF No. 127.

Mr. Jeremias testified the cash infusions to the Debtor could not be characterized as capital contributions because "[w]e made no capital contributions. We didn't go to investors and ask for capital contributions. They were short-term loans. I never went to my investors to ask them for more money. It's money that I put up for them temporarily, shortly." May 23, 2022 Tr. 104:17-21, ECF No. 127. Mr. Jeremias further testified that "[i]t's not a capital event. If I were to

go collect it, I don't think [the investors] would give it to me."  May 23, 2022 Tr. 105:5-6, ECF No. 127.

Ms. Gruman also testified respecting the characterization of the cash infusions as short-term loans.  May 23, 2022 Tr. 145:13-146:25, ECF No. 127.  Ms. Gruman testified that capital contributions can be distinguished from loans because contributions come from investors *pro rata* and loans come from those with no equity in the entity.  May 23, 2022 Tr. 150:13-16, ECF No. 127.  She further testified she would characterize a short-term loan as a "loan and exchange" even if no interest was charged, depending on "the clients and their needs."  May 23, 2022 Tr. 150:21 – 151:3, ECF No. 127.  She further testified she would characterize a cash infusion as a loan even if there is no stated maturity date because "it's usually related parties and it's self-understood what it is. You know, if I would need to report to maybe different parties or someone would ask me questions on it or I would put a footnote explaining what it is."  May 23, 2022 Tr. 151:13-17, ECF No. 127.

In the Second Circuit, courts balance the following eleven factors when determining whether an investment characterized as debt should be recharacterized as equity:

(1) the names given to the instruments, if any, evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

(9)  the extent to which the advances were subordinated to the claims of outside creditors;

(10)  the extent to which the advances were used to acquire capital assets; and

(11)  the presence or absence of a sinking fund to provide repayments.

*In re Live Primary, LLC*, 626 B.R. 171, 191 (Bankr. S.D.N.Y. 2021) (quoting *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 749-50 (6th Cir. 2001)) (noting that courts in the Second Circuit "have generally followed the 11-factor *Autostyle* analysis in deciding whether debt should be recharacterized as equity").

There is no dispute the cash infusions were (1) from entities controlled by Mr. Jeremias (May 23, 2022 Tr. 102:4 – 103:2, ECF No. 127); (2) made by Mr. Jeremias on behalf of the investors (May 23, 2022 Tr. 104:17-21, ECF No. 127); (3) interest-free (May 23, 2022 Tr. 103:3-5, ECF No. 127); (4) had no stated maturity date (May 23, 2022 Tr. 103:6-14, ECF No. 127); (5) not memorialized by a writing (May 23, 2022 Tr. 103:15-16, ECF No. 127); and (6) made to the Debtor while the Debtor was undercapitalized and unable to pay its bills as they came due (May 23, 2022 Tr. 103:10-14, ECF No. 127).

The Lender is correct that the cash infusions from companies controlled by Mr. Jeremias more closely resemble contributions to equity as opposed to short-term loans.  Mr. Jeremias' subjective view that the cash infusions should be treated as short-term loans is not relevant.  Ms. Gruman's testimony that the cash infusions should be characterized as loans is afforded no weight because it is inconsistent with controlling law.  Also, she admits her opinion regarding characterization of the cash infusions as loans is based on what her client needs as opposed to accepted financial reporting standards.  She also admits she characterizes short-term, interest-free loans that lack a stated maturity date as loans and exchanges only for purposes of reporting to her clients but would change the description for purposes of reporting to third parties.

Whether characterized as loans or capital contributions, the Debtor's repayments to entities controlled by Mr. Jeremias while mortgage payments went unpaid is some evidence that J Partners will continue to prefer insiders and pay them prior to making mortgage payments, making future payments of principal and interest to the Lender less likely.

> **b.  *The Lender is Prejudiced by the Lack of a "Bad Act" Guaranty from J Partners.***

The Lender claims the change in management makes future payments less likely because none of J Partners' investors are party to a "bad act" guaranty.  Benzion Kohn executed and delivered a "bad act" guaranty to Investors Bank that, among other things, obligated Benzion Kohn to indemnify and hold harmless, Investors Bank and its assigns from damages resulting from any act or failure to act which materially reduces the Property's value, the failure to maintain insurance and pay real estate taxes; the transfer of any interest in the Debtor without prior written consent; and the Debtor's voluntary or involuntary bankruptcy.  The Lender contends:

> [T]his "bad-boy" Guaranty was designed to regulate Benzion Kohn's and the borrower's behavior and disincentivize Benzion Kohn from approving actions detrimental to the Lender, including filing for bankruptcy and other "bad" acts. Post-effective date of the Plan, the Lender would have no such Guaranty protections from any of the J Partners' investors.  In the absence of the Guaranty Protections against the controlling investors, there would be no economic disincentive for the J Partners' investors to again willfully default on payments and again seek bankruptcy protections.

Lender's Pre-Trial Brief at 6-7, ECF No. 115.

The Debtor does not dispute that none of the J Partners investors has executed a "bad act" guaranty for the Loan.  Further, Mr. Jeremias testified that "bad act" guaranties have been required in every real estate financing or refinancing in which he has been involved.  May 23, 2022 Tr. at 86:22-25, ECF No. 127.  The Lender is correct that not having a "bad act" guaranty from the individuals managing the Debtor could diminish the Lender's ability to collect the indebtedness (and impair its collateral) because there would be no personal economic downside for any

individual that currently controls the Debtor if that individual caused the Debtor to engage in conduct the Lender perceived to be a "bad act," such as refusing to pay real estate taxes or insure the Property.

### c.   *The Debtor's Bankruptcy Does Not Materially Impact Refinancing.*

The Lender claims this bankruptcy filing makes the payment of future principal and interest less likely because few lenders will refinance mortgage debt for a borrower that files for bankruptcy. Wiener Decl. ¶ 33. Even if true, the Court does not find the testimony to be persuasive that the Debtor's bankruptcy would materially negatively impact the Debtor's ability to refinance.

### 4.   *The Debtor's Default of the Control Covenants is an Intentional Breach.*

One can infer from Mr. Jeremias' testimony that he is unwilling or unable to understand the Control Covenants. Section 3(i) of the Loan Agreement states: "No equity ownership in the Borrower may be transferred, pledged or encumbered, directly or indirectly, without the prior written consent of the Bank." Decl. of Justin G. Imperato Ex. C, at 71, ECF No. 85. Mr. Jeremias testified, however, that J Partners believed that purchasing a 49.9% stake in the Debtor would not trigger the Control Covenants. *See* May 23, 2022 Tr. 39:7-10, ECF No. 127 ("[W]e took a 49.9% stake and our belief was that we don't trigger a transfer tax or trigger . . . any other covenants for the loan since it was below 49.9 percent."); May 23, 2022 Tr. 71:16-20, ECF No. 127 ("[I]t was intentionally to be a [49.9 percent] stake because we felt it wouldn't trigger . . . a transfer tax as well as it wouldn't trigger any other covenants because we would be less than majority."). Mr. Jeremias testified he believed that if J Partners' purchase triggered a default, the Debtor could cure the default by paying a 1% fee. May 23, 2022 Tr. 74:14-19, ECF No. 127 ("[O]ur opinion was . . . it can be transferred for a 1 percent fee.").

Mr. Jeremias admits J Partners did not obtain Investors Bank's prior consent because it was an emergency. May 23, 2022 Tr. 75:10-13, ECF No. 127 ("[O]ur opinion at the time was it

was an emergency . . . Benzion was bleeding away[.]"); May 23, 2022 Tr.75:20-23, ECF No. 127 (it "needed to be done quite quickly in an emergency situation.").  It is not credible that someone as experienced in real estate as Mr. Jeremias interpreted the Control Covenants to permit a transfer of 49.9% of the interests in the Debtor if Investors Bank received a fee.[2]  Further, the "emergency" was not J Partners' emergency, it was Benzion Kohn's emergency.  A more likely explanation was that J Partners made a business decision to acquire the interests in the Debtor, and if Investors Bank learned of the transfer, J Partners would deal with it.  *See* May 23, 2022 Tr. 119:18-23, ECF No. 127 (Jeremias testified that J Group did not seek Investors Bank's prior approval because several investors had relationships with Investors Bank).  Each investor in J Partners could take this business risk because no investor in J Partners had signed a "bad act" guaranty.  J Partners miscalculated its business risk however, as it did not anticipate that Investors Bank would sell the Loan to an entity incentivized to acquire the Property as opposed to collecting the indebtedness.

## CONCLUSION

The Court agrees with Justice Cardozo that there is nothing sacrosanct about mortgages and equity can prevent a mortgagee from enforcing an acceleration clause if it "would work a hardship approaching the oppression of a penalty."  *Graf*, 254 N.Y. at 8-9.  Further, the Court agrees with Judge Drain's conclusion in *Stanhope*, that a mortgagee cannot accelerate a loan and charge default interest based on an unintentional, immaterial, nonmonetary default that does no harm to a mortgagee or its collateral.  The equitable principals articulated in *Graf* and *Stanhope*, however, have no application here.

---

[2] Mr. Jeremias has extensive experience in building management.  May 23, 2022 Tr. 24:16-23, ECF No. 127.  Mr. Jeremias has experience with real estate finance having been in involved in at least at least ten real estate financing or refinancing transactions.  May 23, 2022 Tr. 87:1-5, ECF No. 127.

Although the Debtor views the Lender's acquisition of the loan to call a default as bad faith, the Lender's ability to call a default is rooted in the Debtor's business decision to conceal the change in its ownership from Investors Bank and to withhold debt service payments to obtain a forbearance.  Further, regardless of whether J Partners is a better property manager than Benzion Kohn, the loan agreement includes a prohibition on a change of control.  The Lender is entitled to have Benzion Kohn at the Debtor's helm or to accelerate the loan and be paid in full.

Accordingly, the Court holds that the Plan cannot be confirmed to the extent that it provides for the Loan to be reinstated.

The Lender is directed to submit an order consistent with this memorandum.

Dated: October 6, 2022
       Brooklyn, New York

Jil Mazer-Marino
United States Bankruptcy Judge