UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

975 WALTON BRONX LLC,

                                       Debtor.
-----------------------------------------------------------------X

Chapter 11

Case No.: 21-40487-jmm

**MEMORANDUM DECISION ON CONFIRMATION OF DEBTOR'S AMENDED
CHAPTER 11 PLAN OF REORGANIZATION AND WALTON IMPROVEMENT
<u>GROUP LLC'S PLAN OF LIQUIDATION FOR THE DEBTOR</u>**

Appearances:

Kevin J. Nash, Esq.
J. Ted Donovan, Esq.
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, New York 10036
*Counsel for Debtor*

Benjamin Mintz, Esq.
Justin Imperato, Esq.
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
*Counsel for Walton Improvement Group LLC*

## INTRODUCTION

This case is about who will own 975 Walton Avenue (the "Property"), a mixed-use building with 182 residential apartments and five stores that is across the street from Yankee Stadium.  The Property is owned by 975 Walton Bronx LLC (the "Debtor").  The Debtor seeks confirmation of its plan of reorganization, which provides for the Debtor to retain ownership of the Property.  Walton Improvement Group LLC (the "Lender"), the mortgagee, seeks confirmation of its competing plan, which provides for the Debtor to transfer the Property to the Lender.

As set forth below, the Court cannot confirm either plan.  The Debtor's plan cannot be confirmed because the plan impermissibly places the Lender's unsecured claim in the same class as the Lender's secured claim.  The classification of secured and unsecured claims in one class violates section 1122(a) of title 11 of the United States Code (the "Bankruptcy Code").

The Lender's plan cannot be confirmed because it provides for the Lender to receive more than it is owed.  The Lender claims it is owed over $25 million but its claim is nonrecourse and its collateral is valued at only $18 million.  The Lender's plan provides for the Lender to receive all its collateral and to receive additional estate assets that are worth millions.  The Lender's receipt of those additional estate assets results in a distribution to the Lender that is greater than the allowed amount of the Lender's nonrecourse, secured claim.  A plan that pays a creditor more than the allowed amount of its claim violates Bankruptcy Code section 1129(b)(1)'s requirement that a plan be "fair and equitable" and cannot be confirmed.

## JURISDICTION

The Court has jurisdiction to hear and determine these contested matters under 28 U.S.C. §§ 157(a), 157(b)(1) and 1334(b), and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York, dated August 28, 1986, as

amended by Order dated December 5, 2012.  These contested matters are core proceedings under

28 U.S.C. §§ 157(b)(2)(A) and (L).  This decision constitutes the Court's findings of fact and

conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy

Procedure.

## VENUE

Venue of this case and these matters are proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

The Loan Documents

The Debtor financed the Property's acquisition with a $22,500,000.00 loan (the "Loan")

from Investors Bank.  In connection with the financing, the Debtor executed and delivered to

Investors Bank: (a) a loan agreement dated April 1, 2015 (Lender Trial Ex. K, ECF No. 191-11

(the "Loan Agreement")); (b) a promissory note in the principal amount of $22,500,000.00

(Lender Trial Ex. L, ECF No. 191-12 (the "Note")); (c) a mortgage and security agreement dated

April 1, 2015 (the "Mortgage") attached to the Mortgage Consolidation, Extension and

Modification Agreement (the "CEMA") (Lender Trial Ex. J, ECF No. 191-10); and an

assignment of leases (Lender Trial Ex. E, ECF No. 85-5 at 4 (the "Assignment of Leases"[1] and

together with the Loan Agreement, Note, Mortgage, CEMA, and other related documents, the

"Loan Documents")).

Paragraph 9(f) of the Note provides that the indebtedness owed by the Debtor under the

Loan Documents is nonrecourse and states:

> The liability of the [Debtor] shall be enforceable only out of the [Property] and
> there shall be no personal liability on the part of the [Debtor] or any of its principals
> outside of their respective interests in the [Property] and other than as set forth in
> any guaranty or indemnity agreement given in connection with the Loan, if

---

[1] An Absolute Assignment of Leases and Rents dated April 1, 2015 is referenced in Schedule I to the CEMA,
however, a copy of the lease assignment has not been provided to the Court.

> applicable. Notwithstanding the foregoing, the Bank may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable the Bank to enforce and realize upon its interest under the Loan Documents or in the [Property]; provided, however, that except as specifically provided herein, the Bank agrees that it shall not sue for, seek or demand any deficiency judgment against the [Debtor] or its principals in any such action or proceeding under or by reason of or in connection with any Loan Document

Note ¶ 9(f).  *See also* Loan Agreement ¶ 7(h) (providing that the indebtedness under the Loan Documents is limited as set forth in the Note).

The Debtor's obligations under the Loan Documents are secured by a mortgage on the Property, an assignment of all leases and rents, and liens on and security interests in substantially all the Debtor's assets and proceeds thereof.  Mortgage at 2-3.  The Debtor does not challenge the validity, priority, or perfection of the Mortgage or the Lender's other liens or security interests.

Debtor's Default under the Loan Documents

In January 2018, the Debtor's sole member transferred at least 49.99% of its ownership interests in the Debtor to The J Partners Group.  Tr. of May 23, 2022 Hr'g, 13:19 – 14:15, ECF No. 127.  The transfer violated covenants in the Loan Agreement restricting a change in control of the Debtor (the "Control Covenant Default").  Loan Agreement ¶¶ 2(a), 3(d), 7(a)(ix).

In April 2020, just after the start of the Covid-19 pandemic, the Debtor defaulted on the Loan by failing to make debt service payments.  Decl. of Daniel Wiener ¶ 9, ECF No. 197 (the "Wiener Decl.").  In August 2020, Investors Bank gave notice of default and acceleration based on the Debtor's failure to make installment payments and failure to provide financial information.  Am. Decl. of Daniel Wiener ¶ 16, ECF No. 136 (the "Am. Wiener Decl.");  *see also* Lender Trial Ex. R, ECF No. 86-5.  In or about October 2020, Investors Bank assigned the Loan to the Lender.  Wiener Decl. ¶ 10.  In December 2020, the Lender sent the Debtor a second letter of

4

default and acceleration again based on the Debtor's failure to make installment payments.  Am. Wiener Decl.  ¶ 16; *see also* Lender Trial Ex. S, ECF No. 86-6.

On February 23, 2021, the Lender commenced a foreclosure action in Supreme Court, Bronx County, Index No. 802465/2021E.  Wiener Decl. ¶ 11.

This Bankruptcy Case

On February 25, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing this case.  Pet., ECF No. 1.

Adequate Protection Stipulation

On June 4, 2021, the Court entered an order approving a stipulation permitting the Debtor to use the Lender's cash collateral.  Stipulation and Consent Order (A) Authorizing Debtor's Use of Cash Collateral and (B) Providing Adequate Protection Therefore, ECF No. 34 (the "Cash Collateral Stipulation"); Stipulation and Consent Order Extending Prior Stipulation and Consent Order for the Use of Cash Collateral, ECF No. 140.

The Cash Collateral Stipulation required the Debtor to make adequate protection payments to the Lender as follows:

> [T]he Debtor shall pay to  the Lender by wire transfer (a) the monthly sum of $101,682 beginning on May 1, 2021 and continuing monthly thereafter . . . plus (b) within three (3) business days after entry of this [s]tipulation, $217,889.66 in respect of the period from the Petition Date through April 30, 2021 (collectively, the "Adequate Protection Payments").  .  .  .  Notwithstanding anything to the contrary in the foregoing, the Debtor reserves the right to apply and re-allocate the Adequate Protection Payments to reduce the principal indebtedness to the extent that the Lender is not fully secured within the meaning of 11 U.S.C. §506(a).

Cash Collateral Stipulation ¶ 9.  The Debtor claims, and the Lender does not appear to dispute, that the Debtor paid $2,643,732.00 in adequate protection payments (the "Adequate Protection Payments") through April 2023.  Debtor's Post-Trial Mem. of Law in Supp. of Confirmation of

its Alternate Cramdown Option and in Opp'n to the Confirmation of the Senior Lender's Plan,

ECF No. 224 at 3.

The Cash Collateral Stipulation granted the Lender certain liens on estate assets as

adequate protection for the Debtor's use of cash collateral as follows:

> As adequate protection for the [a]dequate [p]rotection [o]bligations, in accordance
> with Bankruptcy Code §§ 361 and 363, the Lender is hereby granted . . . a valid
> and perfected replacement security interest in, and lien on (the "Adequate
> Protection Liens"), all of the Debtor's now owned and hereafter acquired real and
> personal property, tangible and intangible assets, and rights of any kind or nature,
> wherever located, including, without limitation . . . all real property, leaseholds,
> rents and profits and proceeds thereof, all causes of action whether pursuant to
> federal or applicable state law, and the proceeds thereof . . . and including (but
> solely to the extent that the Lender can prove that its interest in the [p]repetition
> [c]ollateral declined in value as a result of the Debtor's use of the [c]ash [c]ollateral,
> the Debtor's use, sale, lease, or depreciation of the [p]repetition [c]ollateral, or the
> imposition of the automatic stay under Bankruptcy Code § 362(a)) proceeds or
> property recovered in respect of any avoidance claims and causes of action brought
> by the Debtor under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 550.

Cash Collateral Stipulation ¶ 4.  The Debtor has not commenced any actions or recovered any

proceeds or property respecting any avoidance claims or causes of action under Bankruptcy

Code sections 544, 545, 547, 548, 549, or 550.

<u>The Lender's Claim</u>

The Lender timely filed a proof of claim, identified on the claims register as Proof of

Claim 7-1, asserting a claim of $23,984,121.65 as of the Petition Date.  Proof of Claim No. 7-

1.  The Lender's proof of claim reserved the Lender's rights to assert additional claims for,

among other things, fees, costs, charges, expenses, and legal fees.  Addendum to Proof of Claim

No. 7-1 ¶ 8.  The proof of claim asserts the Lender's claim is secured by substantially all the

Debtor's assets, including the Property, rents and proceeds from the Property, and proceeds of

insurance policies covering the Property.  *Id.* ¶¶ 2, 9.  The Lender's proof of claim also states:

> As of the filing of this [c]laim, the value of the [p]repetition [c]ollateral has not been
> determined, but the actual secured and unsecured portion of the [c]laim may be

determined by a [c]ourt order.  If it is determined that the value of the [p]repetition [c]ollateral is that than [sic] the allowed amount of this [c]laim, any resulting deficiency is an unsecured claim.

*Id.* ¶ 9.

On September 29, 2022, the Lender amended its proof of claim to increase the amount of the claim from $23,984,121.65 to $25,458,110.80, plus any other amounts owing under the Loan Documents.  Addendum to Am. Proof of Claim No. 7-2 ¶ 8.  The amended proof of claim did not quantify the amount of the Lender's secured claim and reiterated that the value of the Lender's collateral had not yet been determined.  *Id*.  On January 20, 2023, the Debtor filed an objection to the Lender's amended proof of claim arguing the claim is overstated due to the erroneous calculation of default interest and the inclusion of late charges and legal fees.  Debtor's Obj. Seeking to Reduce the Am. Secured Claim Number 7-2 Filed by Lender, ECF No. 204.

None of the Debtor, the Lender, or other party in interest moved to fix the allowed amount of the Lender's secured claim; however, at the January 26, 2023 hearing on confirmation of the Debtor Plan and the Lender Plan (each as defined below), the Debtor and the Lender agreed that, for plan confirmation purposes, the Lender's collateral would be valued at $18 million.  Tr. of Jan. 26, 2023 Hr'g, 28:19 – 29:2; 72:23 – 74:2, ECF No. 208.  *See also* Tr. of June 14, 2023 Hr'g __:__.  The Debtor and the Lender also agreed that the Lender's claim is undersecured.  Tr. of Feb. 24, 2023 Hr'g, 167:20 – 24, ECF No. 215; Tr. of Jan. 26, 2023 Hr'g, 25:7 – 11, ECF No. 208.

The Debtor's Proposed Plan of Reorganization

On November 22, 2021, the Debtor filed its amended chapter 11 plan of reorganization and related disclosure statement.  Debtor's Am. Chapter 11 Plan of Reorganization, ECF No. 57 (the "Debtor Plan"); Debtor's Am. Disclosure Statement, ECF No. 58.  The Debtor Plan classifies the Lender's claims in Class 1.  Debtor Plan at 7.  The Debtor Plan contemplates that

7

the Debtor will cure all defaults under the Loan Documents, deaccelerate the indebtedness, and reinstate the Loan's terms pursuant to Bankruptcy Code sections 1124(2) and 1123(d) (the "<u>Cure and Reinstatement Option</u>").  *Id.* at 1.

Before the Debtor filed the Debtor Plan, the Lender communicated to the Debtor that the Lender would object to the Cure and Reinstatement Option because, among other things, the Debtor Plan did not cure the Control Covenant Default.  Anticipating the Lender's objection, the Debtor Plan provides if the Court does not approve the Cure and Reinstatement Option, the Debtor will refinance the Lender's claim (the "<u>Refinancing Option</u>").  *Id.* at 8.  Alternatively, the Debtor Plan preserves the Debtor's right to "cramdown" the Debtor Plan pursuant to Bankruptcy Code section 1129(b)(2)(A) (the "<u>Till Cramdown Option</u>").  *Id.* at 8, 9.  Under the Till Cramdown Option, the Debtor would pay the Lender's allowed claim in deferred cash payments over ten (10) years, with interest at 3.25% plus 100 basis points.  *Id.* at 9.  Additionally, the Lender would have the option to participate in the reorganized debtor as an equity holder on a *pro rata* basis with the Debtor's current interest holders to the extent the Lender funds the Debtor Plan.  *Id.* at 9.

Regarding treatment of other classes of claims and interests, the Debtor Plan provides:

| <u>Class</u> | <u>Claims in Class</u> | <u>Treatment</u> |
|---|---|---|
| 2 | 975 Thor Walton Avenue LLC's claim of $2,600,290 secured by a judgment lien on the Property (the "<u>Thor Claim</u>").  ECF 1, Schedule D.<br><br>(Impaired and entitled to vote to accept or reject the Debtor Plan) | Creditor to receive a cash dividend in the sum of $500,000 paid on the effective date of the Debtor Plan. |

| Class | Claims in Class | Treatment |
|-------|-----------------|-----------|
| 3 | Claims of all general unsecured creditors<br><br>(Impaired and entitled to vote to accept or reject the Debtor Plan) | Each unsecured claim holder to receive a fifteen percent (15%) dividend to be paid in equal quarterly installments over a period of one (1) year from the effective date of the Debtor Plan. |
| 4 | Interests of all equity holders<br><br>(Not entitled to vote to accept or reject the Debtor Plan due to insider status) | Existing prepetition equity interest to be cancelled in favor of reconstituting and recapitalizing the membership interests of the reorganized debtor. |

*Id.* at 9-10.

Bifurcated Hearing on Confirmation of Debtor Plan

The Debtor and the Lender agreed the Court would bifurcate the confirmation hearing on the Debtor Plan. The Court would first consider whether the Debtor could confirm the Cure and Reinstatement Option. If the Court did not approve the Cure and Reinstatement Option, a second hearing would be held to consider confirmation based on the Refinancing Option or the Till Cramdown Option. On consent of the Lender and the Debtor, the Court entered an order that, among other things, approved the Debtor's amended disclosure statement and plan solicitation procedures and scheduled a hearing to consider the Debtor Plan's Cure and Reinstatement Option. Order (A) Approving the Debtor's Am. Disclosure Statement; (B) Scheduling a Hr'g to Consider Confirmation of the Debtor's Am. Plan of Reorganization; (C) Approving Notice Procedures Relating Thereto; and (D) Extending the Debtor's Exclusive Period to Solicit Acceptances or Rejections to the Debtor's Am. Plan of Reorganization, ECF No. 65. If the Court denied confirmation of the Debtor Plan's Cure and Reinstatement Option, the Debtor would be permitted to file a supplement (the "Supplement") to the Debtor's amended

disclosure statement describing the classification and treatment of the Lender's claim under the Refinancing Option or Till Cramdown Option. *Id*. at 3.

On February 24, 2021, the Debtor filed a voting certification stating that Class 1 (the Lender's claim) voted to reject the Debtor Plan, Class 2 did not vote on the Debtor Plan, and Class 3 voted unanimously to accept the Debtor Plan. Certificate as to Balloting, ECF No. 73. The Lender's ballot is attached to the certification. *Id*. at 4. The pre-printed ballot states the Lender is a "holder of an impaired Class 1 and Class 3 claim against [the Debtor] in the amount of $_____." *Id*. The Lender inserted "$23,984,121.65" in the blank without allocating the claim between Class 1 (the Lender's secured claim) and Class 3 (the class of general unsecured creditors). *Id*.

On April 7, 2022, the Court rendered its first of two decisions respecting the Cure and Reinstatement Option. Tr. of Apr. 7, 2022 Hr'g, ECF No. 105. Among other things, the Court held the Control Covenant Default was a material breach. *Id.* at 8:16 – 23; 32:1 – 2. Unless the Debtor cured the Control Covenant Default, the Debtor Plan could not reinstate the Loan under Bankruptcy Code section 1124(2). *Id.* at 18:17 – 20. However, notwithstanding the Debtor's failure to cure the Control Covenant Default, the Lender could be precluded from accelerating the Loan under New York State law. *See, e.g., In re Stanhope, LLC*, 625 B.R. 753 (Bankr. S.D.N.Y. 2021). If that were the case, then the Loan effectively would be reinstated notwithstanding the Debtor's failure to cure the Control Covenant Default. *Id.* at 25:15 – 25; 27:9 – 21; 28:12 – 17.

After a three-day trial, this Court issued its second decision regarding the Cure and Reinstatement Option. Am. Mem. Decision on the Debtor's Ability to Cure and Reinstate the Lender's Loan, ECF No. 160. The Court held that applicable State law would not preclude the

Lender from accelerating the Loan, and therefore, the Debtor could not confirm the Cure and Reinstatement Option. *Id.* at 3-8, 25.

<u>The Revised Till Cramdown Option</u>

On November 1, 2022, the Debtor filed the Supplement electing to pursue the Till Cramdown Option as opposed to the Refinancing Option. Suppl. to Debtor's Am. Disclosure Statement – Notice of Debtor's Election to Pursue Alternative Option, ECF No. 170.

The Supplement defines the Lender's claim as the sum of the principal debt due to the Lender as of the Petition Date ($21,667,046) plus accrued pre-petition interest for the period April 1, 2020 through February 24, 2021 of $1,665,097.64, reimbursement of taxes, reasonable pre-petition fees to be determined, and allowed expenses to be determined. *Id.* at 2. The Supplement provides that the Lender's claim will be paid as follows:

- First, the Adequate Protection Payments will be applied to reduce the Lender's claim.

- Second, a payment of at least $3 million will be paid to the Lender on the Debtor Plan's effective date.

- Third, the Debtor will issue to the Lender a promissory note in the principal amount of the claim less the Adequate Protection Payments and the $3 million payment. The note would accrue interest at 5.156% and would mature in seven years.

*Id*. at 2, 3.

On November 15, 2022, the Lender filed a statement confirming it would not elect its undersecured claim to be treated as a fully secured claim pursuant to Bankruptcy Code section 1111(b)(2). Lender's Statement and Reservation of Rights in Resp. to Debtor's Suppl. to Debtor's Am. Disclosure Statement, ECF 173 ¶ 4.

<u>The Lender's Plan of Liquidation</u>

On October 10, 2022, the Lender filed a plan of liquidation for the Debtor (Lender's Plan of Liquidation for the Debtor, ECF No. 162 (the "<u>Lender Plan</u>")) and a related disclosure statement (Disclosure Statement for Lender's Plan of Liquidation for the Debtor, ECF No. 163 (the "<u>Lender Disclosure Statement</u>")).

Lender Plan sections 1.12 and 1.53 provide for the Lender's claim to be allowed in an amount not less than $25,458,110.80 (the "<u>Allowed Lender's Claim</u>").  Lender Plan at 2, 8. Lender Plan section 3.5 provides for the treatment of Class 2, which consists of the Allowed Lender's Claim, and states:

> On the [e]ffective [d]ate, on account of and in partial satisfaction of the Allowed Lender's Claim, the Debtor shall transfer title to the Property and the Assets . . . directly to the Lender (or its designee), free and clear of all [c]laims, [l]iens, charges, interests and encumbrances . . . The Lender shall retain and in its discretion apply the Adequate Protection Payments received from the Debtor.

*Id.* at 15.  Lender Plan section 1.13 defines "Assets" as

> [A]ll of the right, title and interest in and to property of whatever type or nature owned by the Debtor or subsequently acquired by the Debtor, including any property of the [e]state for purposes of section 541 of the Bankruptcy Code, including the Property and all appurtenant rights, the Debtor's books and records, [c]ash, [c]auses of [a]ction (including the Avoidance Actions), all rights and claims under insurance policies (including the right to any refunded premiums) naming the Debtor as an insured and/or an additional insured, and other incidental property.

*Id.* at 3 (the "<u>Assets</u>").

Section 6.1 of the Lender Plan provides that the Lender also will receive the proceeds of certain causes of action arising under chapter 5 of the Bankruptcy Code (the "<u>Avoidance Actions</u>") and states:

> The Debtor and, upon confirmation of this [p]lan and entry of the [c]onfirmation [o]rder, the Lender waive and release the right to pursue preference claims against non-[i]nsiders under section 547 of the Bankruptcy Code. All other [c]auses of [a]ction are fully preserved and reserved. All rights pursuant to section 502, 544, 545, and 546 of the Bankruptcy Code and all Avoidance Actions (except those

brought against non-[i]nsiders pursuant to section 547 of the Bankruptcy Code) shall be preserved, <u>provided</u>, <u>however</u>, that in connection with the [p]roperty [t]ransfer, the Debtor shall transfer the [c]auses of [a]ction, including the Avoidance Actions (other than those brought against non-[i]nsiders under section 547 of the Bankruptcy Code), to the Lender.

*Id.* at 19.  The Lender claims that $866,310.65 of avoidable transfers were made to the Debtor's insiders.  Lender's Obj. to Confirmation of the Debtor's Plan ¶ 53, ECF No. 190.

Additionally, Lender Plan sections 8.1 and 8.4 provide for all tenant leases, as defined in the Lender Plan (the "<u>Tenant Leases</u>"), to be assumed and assigned to the Lender and the "Lender (or its designee) shall assume all benefits and obligations of the Debtor as landlord under all assigned Tenant Leases from and after the [e]ffective [d]ate."  Lender Plan at 22-23.

The Lender Plan provides for the remaining classes of claims and interests to be treated as follows:

| <u>Class</u> | <u>Claims</u> | <u>Treatment</u> |
|---|---|---|
| 1 | Thor Claim<br>(Impaired and entitled to vote to accept or reject the Lender Plan) | Creditor to receive $550,000 cash payment from the Lender on the Lender Plan's distribution date. |
| 3 | Priority non-tax claims<br>(Unimpaired and deemed to accept the Lender Plan) | Creditors shall be paid in full in cash by the Lender with interest. |
| 4 | General unsecured claims (excluding the claim filed by Shinelle Sookdeo)<br>(Impaired and entitled to vote to accept or reject the Lender Plan) | Creditors to receive cash payment from the Lender equal to twenty percent (20%) of the allowed amount of their claims on the distribution date, without interest. |
| 5 | The $5 million personal injury claim filed by Shinelle Sookdeo<br>(Impaired and entitled to vote to accept or reject the Lender Plan) | Sookdeo shall receive the lesser of (a) the allowed Sookdeo Claim and (b) the amount of insurance (net of any deductible) available to satisfy the allowed Sookdeo Claim, which amount shall be sourced and paid exclusively by the Debtor's liability insurer. |

| Class | Claims | Treatment |
|-------|--------|-----------|
| 6 | Interest holders<br><br>(Impaired and conclusively presumed to reject the Lender Plan) | No distribution shall be made to, or property of the estate retained by, Interest Holders.  Each Interest Holder's interest shall be deemed cancelled and extinguished. |

*Id.* at 15-16.  The Lender agreed to fund an escrow account with no less than $1.35 million to fund the Lender Plan.  *Id.* at 18; Tr. of Jan. 26, 2023 Hr'g, 73:3-8, ECF No. 208.  On November 23, 2022, the Court entered an order approving the Lender Disclosure Statement and solicitation package.  Order Approving Lender's Disclosure Statement, ECF No. 174.

Class 1 (the Thor Claim) voted to reject the Lender Plan. Voting Certification for Lender Plan ¶ 5, ECF No. 188.  The Lender voted its Class 2 claim to accept the Lender Plan.  *Id.*  None of the holders of claims in Classes 4 (the class of general unsecured creditors) or 5 (the Sookdeo Claim) voted on the Lender Plan.  *Id.* ¶ 6.

## APPLICABLE LEGAL STANDARDS

Under Bankruptcy Code section 1129(c), the Court may confirm only one plan.  *See* 11 U.S.C. § 1129(c).  When two or more parties submit competing plans that both meet the requirements of sections 1129(a) and (b), the Court must "consider the preferences of creditors and equity security holders in determining which plan to confirm[.]"  *Id.*

However, the threshold issue is one of confirmability, and "[t]he first step at a confirmation hearing on competing plans is to determine whether one or more of the plans are confirmable."  *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999).  The Court has an independent duty to ensure that the requirements of Bankruptcy Code section 1129 are satisfied.  *See In re Young Broad. Inc.*, 430 B.R 99, 139 (Bankr. S.D.N.Y. 2010) (citations omitted).

## DISCUSSION

<u>The Debtor Plan Is Not Confirmable</u>

Under the Debtor Plan, the allowed amount of the Lender's claim is at least $23,332,143.60. Supplement at 2. The Lender's collateral is worth $18 million. Tr. of Jan. 26, 2023 Hr'g, 28:19 – 29:2; 72:23 – 74:2, ECF No. 208; Tr. of June 14, 2023 Hr'g __:__. Therefore, under Bankruptcy Code section 506, the Lender should have a secured claim of $18 million and an unsecured claim of at least $5,332,143.60. *See* 11 U.S.C. § 506 ("an allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property …  and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim.").[2]

Bankruptcy Code section 1122(a) states, in relevant part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class." 11 U.S.C. § 1122(a). Bankruptcy Code section 1122(a) prohibits the classification of secured and unsecured claims in the same class. *See In re D & W Realty Corp.*, 165 B.R. 127, 129 (S.D.N.Y. 1994) (mortgagee's secured claim and unsecured deficiency claim cannot be classified in same class because "a secured claim and an unsecured claim, even those of the same creditor, are about as dissimilar as two claims can be."); *In re Sullivan*, 26 B.R. 677, 678 (Bankr. W.D.N.Y. 1982) (classification of secured claim and unsecured priority claim in same class was improper); *In re 266 Washington Assocs.*, 141 B.R.

---

[2] As set forth more fully below, Bankruptcy Code section 1111(b) converts nonrecourse claims to recourse claims, unless the creditor's collateral is sold or the creditor elects to be treated as fully secured. *See* 11 U.S.C. § 1111(b). The Debtor Plan provides for the Debtor to retain, not sell, the Lender's collateral. Therefore, the Lender would be entitled to assert its unsecured deficiency claim under the Debtor Plan even though under the Loan Documents, the Lender's claim is nonrecourse.

275, 285 (Bankr. E.D.N.Y. 1992), *aff'd sub nom. In re Washington Assocs*., 147 B.R. 827, 828

(E.D.N.Y. 1992) (plan impermissibly classified mortgagee's secured claim and unsecured

deficiency claim in one class); *cf. In re Claremont Towers Co.*, 175 B.R. 157, 168 (Bankr. D.N.J.

1994) (each secured claim must be separately classified).

   Bankruptcy Code section 1111(b) provides an exception to the prohibition on classifying

a creditor's secured and unsecured claims in one class. *See* 11 U.S.C. § 1111(b)(2). That

Bankruptcy Code section permits a creditor to elect for its secured claim and unsecured

deficiency claim to be treated as one fully secured claim (the "<u>1111(b) election</u>"). *Id.* A debtor

who is proposing a plan, however, cannot make an 1111(b) election on the creditor's behalf. *See*

*In re Washington Assocs*., 147 B.R. at 830; *In re B & B W. 164th St. Corp.,* 147 B.R. 832, 838

(Bankr. E.D.N.Y. 1992); *In re Channel Realty Assocs. Ltd. Partnership*, 142 B.R. 597, 600

(Bankr. D. Mass. 1992); *In re Birdneck Apartment Assocs., II, L.P.*, 156 B.R. 499, 506 (Bankr.

E.D. Va. 1993); *In re Griswold Bldg., LLC*, 420 B.R. 666, 695 (Bankr. E.D. Mich. 2009).

   The Debtor contends the classification of the Lender's secured and unsecured claims in

Class 1 is proper because the Lender effectively took the 1111(b) election. Tr. of Jan. 26, 2023

Hr'g, 15:12-18, ECF No. 208. The Debtor argues that the Lender's failure to designate on its

ballot the portion of its claim to be voted in Class 1 and Class 3 should be interpreted to mean

that the Lender opted to have its entire claim treated as a Class 1 secured claim. Tr. of Feb. 24,

2023 Hr'g, 165:24 – 166:4; 168:1-8, ECF No. 215. The Debtor also argues that the Lender's

failure to quantify its unsecured deficiency claim in its proof of claim indicates the Lender

intended for its entire claim to be treated as a secured claim. *Id.* at 169:2-7; 172:16-21.

The Debtor's arguments are unpersuasive. First, the Lender affirmatively stated it was not taking the 1111(b) election. Lender's Statement and Reservation of Rights in Resp. to Debtor's Suppl. to Debtor's Am. Disclosure Statement, ECF 173 ¶ 4.

Second, the addendum to the proof of claim states if the value of the Property is less than the allowed amount of the claim, any resulting deficiency would be an unsecured claim. Addendum to Proof of Claim No. 7-1 ¶ 9; Addendum to Proof of Am. Claim No. 7-2 ¶ 10. The value of the Lender's collateral (which includes the Property) is at least $5 million less than the allowed amount of the Lender's claim. Tr. of Feb. 24, 2023 Hr'g, 167:20 – 24, ECF No. 215; Tr. of Jan. 26, 2023 Hr'g, 25:7 – 11, ECF No. 208; Tr. of June 14, 2023 Hr'g, __: __. Accordingly, the Court does not interpret the proof of claim as asserting a claim that is fully secured.

Third, the Court questions the reasonableness of the Debtor's conclusion that the Lender's failure to fix its secured and unsecured claims in its ballot and proof of claim equates to an 1111(b) election. The Court agrees with the Debtor that the Lender intentionally did not fix the amount of its secured claim. However, the Debtor also chose not to fix the Lender's secured claim, even though the Debtor had no doubt the Lender's claim was undersecured. Tr. of Feb. 24, 2023 Hr'g, 167:20-21, ECF No. 215. Although the Debtor objected to the Lender's amended proof of claim, the objection requested only a reduction in the dollar amount of the claim and was silent regarding the bifurcation of the Lender's claim into secured and unsecured claims. Debtor's Obj. Seeking to Reduce the Am. Secured Claim No. 7-2 Filed by Lender, ECF No. 204. It appears both the Debtor and the Lender had reasons not to fix the allowed amount of the Lender's secured claim until prompted by the Court to do so at the hearings on confirmation of both plans.

The Debtor laments that, had it known the Lender was asserting a deficiency claim, the Debtor would have proposed a different plan that paid the Lender's secured and unsecured claims in full over time.  Tr. of Feb. 24, 2023 Hr'g, 170:4-12, ECF No. 215.  The Debtor claims its hypothetical plan would have been easier to confirm than the Debtor Plan.  *Id.* at 170:4-12; 171:8-9, 11-20.  The Court cannot alter the fact that the Debtor – knowing the Lender was undersecured – proposed a plan that impermissibly made the 1111(b) election for the Lender instead of a plan that bifurcated the Lender's claim and paid the Lender's secured and unsecured claims in full over time.

The Lender raises other objections to confirmation of the Debtor Plan.  The Court need not consider the Lender's other objections to confirmation of the Debtor Plan as the Court has determined the Debtor Plan cannot be confirmed due to the improper classification of the Lender's secured and unsecured claims in Class 1.

<u>The Lender Plan is Not Confirmable</u>

The Lender Plan was rejected by Class 1 (the Thor Claim).  Voting Certification for Lender Plan ¶ 5, ECF No. 188.  Additionally, the plan was deemed to have been rejected by Class 6 (the Class of Interest Holders).  *Id.*  Therefore, the Lender Plan cannot be confirmed unless the Lender Plan is "fair and equitable" respecting the Class 1 claim and the Class 6 interests.  *See* 11 U.S.C. § 1129(b)(1) ("the court shall confirm the plan … if the plan … is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

A plan is not fair and equitable if creditors or interest holders receive more than they are owed.  As stated in a noted bankruptcy treatise:

A plan that pays a creditor or interest holder a premium over the allowed amount of its claim is not fair and equitable.  Once the participant receives or retains

> property equal to its claim, it may receive no more.  The reason for this rule is obvious, and goes back to the basic understanding between debt and equity. Holders of debt traditionally contract for repayment of principal and interest, but no more; after that, the residual goes to equity.

7 Collier on Bankruptcy ¶ 1129.03 (16th ed. 2023).

Under the Lender Plan, the Lender is to receive or retain the Property, Tenant Leases, Adequate Protection Payments, Avoidance Actions, and all Assets "in partial satisfaction" of the Allowed Lender's Claim.  Lender Plan at 2-3, 15.  If the Lender Plan is confirmed, the Lender will receive a distribution worth no more than $21,510,042.60 (collateral worth $18,000,000, $2,643,732 of Adequate Protection Payments, and $866,310.65 of Avoidance Actions) on account of the $25,458,110.80 Allowed Lender's Claim and it would not appear that the Lender would be receiving a premium.  However, that analysis fails to account for the impact of Bankruptcy Code section 1111(b)(1)(A)(ii) on the Allowed Lender's Claim.

As explained below, Bankruptcy Code section 1111(b)(1)(A)(ii) limits recoveries to nonrecourse creditors that receive their collateral under a plan of reorganization.  In short, nonrecourse creditors that receive their collateral under a plan may not receive value on account of any unsecured deficiency claim.  Here, the Lender holds a nonrecourse claim and, under the Lender Plan, would receive all its collateral.  The Lender's receipt of all its collateral satisfies the Lender's secured claim in full and the Lender would not be entitled to receive any additional consideration under the Lender Plan.  However, in addition to receiving its collateral, the Lender is receiving the Adequate Protection Payments and the Avoidance Actions.  Accordingly, confirmation of the Lender Plan would result in the Lender receiving a premium on account of its claim and is not fair and equitable.

Bankruptcy Code section 1111(b)(1)(A) states:

> A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse

against the debtor on account of such claim, whether or not such holder has such recourse, unless--

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

11 U.S.C. § 1111(b)(1)(A).  "The text of section 1111(b)(1)(A) essentially instructs courts to ignore nonbankruptcy law on nonrecourse agreements.  Unless otherwise indicated, a court must treat '[a] claim secured by a lien on property of the estate … the same as if the holder of such claim had recourse against the debtor on account of such claim, *whether or not such holder has such recourse.*'"  7 Collier on Bankruptcy ¶ 1111.03[1][a].  In *In re 680 Fifth Ave. Associates*, the Second Circuit Court of Appeals articulated the rationale behind Bankruptcy Code section 1111(b)'s conversion of nonrecourse debt to recourse debt, stating:

> The impetus behind Congress's enactment of § 1111(b) was to protect the rights of nonrecourse lienholders in Chapter 11 reorganizations.    Specifically, in reorganizations where the debtor elects to retain the collateral property, the absence of a public sale would preclude the lienholder from bidding on the property and thereby realizing the value of its lien, and the nonrecourse nature of the debt would leave the lender without a claim for the deficiency.  If the property is valued by the bankruptcy court and effectively "sold" to the debtor outright at the valuation price, the worth of the undersecured lien is reduced to the current market value of the property, and, unlike the situation where he can be a successful bidder, the lienholder is unable to benefit from any unanticipated post-valuation appreciation.

> ***

> The statute thereby puts the Chapter 11 debtor who wishes to retain collateral property in the same position as a person who purchased property "subject to" a mortgage lien would face in the nonbankruptcy context. Outside of bankruptcy, if the owner wanted to retain the property after the mortgage went into default it would either have to work out a satisfactory resolution of the mortgage with the lender or bid on the property at a public foreclosure sale. Section 1111(b) puts Chapter 11 debtors to the same choice of either paying off the debt or forfeiting the property, and thereby allows the debtor to retain the property and effectuate its reorganization, but without frustrating the lienholder's rights.

*In re 680 Fifth Ave. Assocs.*, 29 F.3d 95, 97 (2d Cir. 1994) (citations omitted).

Notwithstanding Bankruptcy Code section 1111(b)(1)(A), a nonrecourse claim will not be converted to a recourse claim in two instances. First, a nonrecourse claim will not be treated as a recourse claim if the secured creditor takes the 1111(b) election. *See* 11 U.S.C. § 1111(b)(1)(A)(i). Second, under Bankruptcy Code section 1111(b)(1)(A)(ii), a nonrecourse claim will not be treated as a recourse claim if the collateral is sold during the bankruptcy case or under a plan. *See* 11 U.S.C. § 1111(b)(1)(A)(ii).

Sales of a creditor's collateral during the case or under a plan do not result in conversion of nonrecourse debt to recourse debt because:

> [t]he ability of the non-recourse lender to purchase its collateral at a sale, with a credit offset allowed for any bid up to the full amount of its debt, insures that the lender is protected. If the property is being sold for less than the outstanding indebtedness and the lender feels this price is too low or if it feels future appreciation will be meaningful, it may bid the full amount of its debt at the sale and take title to the property. With this protection, the non-recourse secured lender does not need and therefore is not given the statutory protection of § 1111(b).

*In re DRW Prop. Co. 82*, 57 B.R. 987, 992 (Bankr. N.D. Tex. 1986).

Although not stated explicitly in the Bankruptcy Code, a nonrecourse claim also will not be converted to a recourse claim if the collateral is returned to the secured creditor. *See id.* at 993; *see also In re Doctors Hosp. of Hyde Park, Inc.,* 330 B.R. 689, 702 (Bankr. N.D. Ill. 2005) ("[I]f the property is not sold, but is abandoned or returned to the secured party, any claim of nonrecourse deficiency would disappear.") (citation omitted); *In re Const. Plaza Assocs. Ltd. P'ship,* 161 B.R. 563, 565 (Bankr. D. Conn. 1993) ("[C]ourts have uniformly held that if a creditor is afforded the right to foreclose on or otherwise receive the return of its collateral, whether pursuant to a plan or otherwise, the creditor is not entitled to receive recourse treatment under § 1111(b).")*; cf. In re Salamon*, 854 F.3d 632, 636 (9th Cir. 2017) (creditor holding junior lien on property was not entitled to treatment as recourse creditor after senior secured creditor

obtained relief from automatic stay and foreclosed on collateral; allowing junior lienholder to

assert deficiency claim against debtors would afford junior lienholder more rights in bankruptcy

than would exist under state law).

Nonrecourse debt is not converted to recourse debt if the collateral is returned to the

secured creditor because:

> [t]he safeguards placed in the Code for non-recourse creditors were placed there to protect the creditor where the Debtor intends to *keep* the property for sale or use in the reorganization process. In other words, conversion of non-recourse claims to recourse claims is the "price" the debtor pays to use encumbered property in its reorganization over the objection of the secured creditor. If the property is voluntarily or involuntarily returned to the secured creditor, the non-recourse secured creditor is no longer entitled to this preferred status.

*In re DRW Prop. Co. 82*, 57 B.R. at 993.

The Lender's claim is nonrecourse and, under the Lender Plan, all property encumbered

by the Lender's liens is to be transferred to the Lender.  *See* Loan Agreement ¶ 7(h); Note ¶ 9(f);

Lender Plan at 3.  Therefore, the Lender is not entitled to conversion of its nonrecourse claim to

a recourse claim.[3]  As the holder of a nonrecourse claim, the Lender may satisfy its claim solely

from its collateral and the Lender is not entitled to payment of its claim from bankruptcy estate

assets thar are not encumbered by the Lender's security interests.  *See In re Taberna Funding IV,

Ltd.*, 594 B.R. 576, 586-87 (Bankr. S.D.N.Y. 2018).  Because the Lender Plan provides for the

Lender to receive all its collateral, the Lender is precluded from receiving any distribution on

---

[3] For the same reasons, the Lender would not be permitted take the 1111(b) election under the Lender Plan. Nonrecourse secured creditors are not eligible for the 1111(b) election if the collateral is to be sold.  *See* 1111(b)(1)(B)(ii) ("a class of claims may not elect application of [Bankruptcy Code section 1111(b)(2)] if "the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.").  The verbiage in Bankruptcy Code section 1111(b)(1)(B)(ii) is identical to, and should be interpreted consistently with, Bankruptcy Code section 1111(b)(1)(A)(ii).  *See Mary Jo C. v. New York State & Loc. Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013) ("Generally, identical words used in different parts of the same statute are presumed to have the same meaning.") (citation omitted).  Accordingly, a nonrecourse secured lender is ineligible to take the election if its collateral is voluntarily returned to the secured creditor just like a creditor with a nonrecourse claim is ineligible for recourse if the plan provides for the creditor to receive its collateral.

account of its $7,458,110.80 deficiency claim (i.e., the difference between the $25,458,110.80

Allowed Lender's Claim and the $18 million secured claim).  However, under the Lender Plan,

the Lender also is receiving the Adequate Protection Payments and the Avoidance Actions.  As

such, the Lender is receiving a premium on account of its allowed secured claim and the Lender

Plan is not "fair and equitable."

The Lender's retention of the Adequate Protections Payments constitutes a premium

notwithstanding the payments may have been sourced from the Lender's cash collateral.  Under

applicable law, adequate protection payments – even if paid from rents encumbered by the

creditor's security interests – must be applied to some portion of a secured creditor's claim.  *See

In re Gramercy Twins Associates*, 187 B.R. 112, 119 (Bankr. S.D.N.Y. 1995).  In instances

where the secured creditor has recourse, adequate protection payments are applied "first to the

Lender's unsecured claim until it is reduced to zero, and then to the post-petition interest, fees,

costs, and charges allowed under Section 506(b), and finally to principal."  *See In re S. Side

House, LLC,* 474 B.R. 391, 397 (Bankr. E.D.N.Y. 2012).  The Adequate Protection Payments

cannot be applied to reduce the Lender's unsecured claims because, under the Lender Plan, the

Lender is not entitled to assert unsecured claims.  The Lender's only remaining claim is its $18

million secured claim, which, under the Lender Plan, is satisfied in full by the transfer to the

Lender of all its collateral.  *See In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1349 (5th Cir.

1989) (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S.

365, 373, 108 S.Ct. 626, 631, 98 L.Ed.2d 740, ___ (1988)).  Consequently, the Lender's

retention of the Adequate Protection Payments results in the Lender's receipt of a $2.8 million

premium on account of its secured claim.[4]

_____

[4] The Lender Plan permits the Lender to apply the Adequate Protection Payments in the Lender's discretion.  Lender
Plan at 15.  Theoretically, the Lender could opt to impermissibly apply the Adequate Protection Payments to

Similarly, the Lender's retention of the Avoidance Actions results in the Lender's receipt of a premium on account of its secured claim.  Causes of action under chapter 5 of the Bankruptcy Code, commonly known as avoidance actions, arise postpetition and, under Bankruptcy Code section 552(a), are not subject to prepetition security interests.  *See In re Residential Capital, LLC*, 497 B.R. 403, 414 (Bankr. S.D.N.Y. 2013).  Notwithstanding the Lender's liens on substantially all the Debtor's assets, the Avoidance Actions are not subject to the Lender's prepetition liens or security interests.  As such, the transfer of the Avoidance Actions to the Lender under the Lender Plan is not a surrender of collateral but a distribution to the Lender that would cause the Lender to receive more than it is owed.  That the Lender was potentially granted a lien on the Avoidance Actions in the Cash Collateral Stipulation does not alter the result.  Under the Cash Collateral Stipulation, the Lender's lien on the Avoidance Actions is limited "solely to the extent that the Lender can prove that its interest in the [p]repetition [c]ollateral declined in value as a result of the Debtor's use of the [c]ash [c]ollateral, the Debtor's use, sale, lease, or depreciation of the [p]repetition [c]ollateral, or the imposition of the automatic stay under Bankruptcy Code § 362(a))."  Cash Collateral Stipulation ¶ 4.  The Lender has not made that showing.

Further, the Lender is receiving a premium notwithstanding the Lender is funding distributions to other creditors.  The Lender Plan contemplates the Lender will escrow approximately $1.35 million to insure the payment of all amounts required to be paid under the Lender Plan as of the effective date.  Wiener Decl. ¶ 36.

---

postpetition interest.  *See* 11 U.S.C. § 506(b) (disallowing postpetition interest on unsecured and undersecured claims)*; see also United Sav. Ass'n of Texas*, 484 U.S. at 372 (explaining that Bankruptcy Code section 506(b) effectively denies undersecured creditors postpetition interest on their claims just as it denies oversecured creditors postpetition interest to the extent that such interest, when added to the principal amount of the claim, will exceed the value of the collateral).

The Court will not consider the Lender's contribution in determining whether the Lender is receiving a premium. The Lender's contribution reflects its business decision to obtain ownership and control of the Property through a chapter 11 plan as opposed to liquidating its collateral through a bankruptcy sale or foreclosure sale. A third-party plan funder looking to capitalize on a business opportunity could not confirm a plan that pays a class of creditors more than the class is owed (perhaps to garner support for the plan funder's plan) if impaired classes reject the plan. The same rule should apply if the plan funder is a creditor in the class that is receiving the premium. Therefore, the funds expended by the Lender to implement its preferred business strategy should not be credited against the distributions it is receiving under the Lender Plan on account of its secured claim. *But cf. In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 6848113, at *11 (Bankr. S.D.N.Y. Nov. 6, 2015) (class consisting of secured creditor that took 1111(b) election and was receiving its collateral was impaired because the secured creditor had agreed to pay the administrative claims of the chapter 11 cases, which would decrease the secured creditor's recovery).

Moreover, even if the Lender's $1.35 million of plan funding were credited against distributions to the Lender under its plan, the Lender would nonetheless receive a premium because the $2,643,732 of Adequate Protection Payments and the value of the Avoidance Actions exceed the $1.35 million of proposed plan funding.

## CONCLUSION

For the reasons set forth above, confirmation of the Debtor Plan is denied and confirmation of the Lender Plan is denied.  The Court will enter an Order consistent with this memorandum.

Dated: June 23, 2023
      Brooklyn, New York



Jil Mazer-Marino
United States Bankruptcy Judge